**UNITED STATES of America, Plaintiff,**

v.

**SHAFFER EQUIPMENT COMPANY, Anna Shaffer, Berwind Land Company, Berwind Corporation and Johns Hopkins University, Defendants.**

**Civ. A. No. 5:90–1195.**

United States District Court, S.D. West Virginia, at Beckley.

June 17, 1992.

Richard B. Stewart, Asst. Atty. Gen., Environment and Natural Resources Div., J. Jared Snyder, Atty., Environmental Enforcement Section, Environment & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., and Carol A. Casto, Asst. U.S. Atty., Charleston, W.Va., for plaintiff.

Johnnie E. Brown, Cynthia M. Salmons, McQueen Law Offices, L.C., and Anthony P. Tokarz, Bowles, Rice, McDavid, Graff & Love, Charleston, W.Va., for Shaffer Equipment Co., Inc. and Anna Shaffer.

John H. Tinney, Carl L. Fletcher, Jr., Spilman, Thomas, Battle & Klostermeyer, for Berwind Land Co. and Berwind Corp.

Robert A. Lockhart, and Robert G. McLusky, Jackson & Kelly, Charleston, W.Va., for Johns Hopkins University.

## MEMORANDUM OPINION AND ORDER

HALLANAN, District Judge.

On April 28 and 29, 1992 came counsel for the parties for a hearing on several pending motions. After noting appearances, the Court granted Plaintiff's Motion to Strike the Jury Demand of Defendants Anna Shaffer and Shaffer Equipment Company, granted Plaintiff's Motion to Dismiss the Third Counterclaim of Defendants Anna Shaffer and Shaffer Equipment Company and denied Plaintiff's Emergency Motion to Exclude Testimony of Defendant's Expert at this hearing. The Court also received evidence concerning Defendants' Motions for Sanctions, Costs and Discipline of Counsel and Defendants' Joint Motion for Dismissal of Action for Bad Faith Misconduct of Counsel and took these motions

under advisement.[1] Lastly, the Court heard oral argument on Defendants' Motion to Dismiss, or Alternatively Strike the Administrative Record and Grant De Novo Review. This motion was taken under advisement as well. Having carefully considered the papers, exhibits, declarations and affidavits presented as well as the testimony from the hearing, the Court is prepared to issue its rulings herein on Defendants' motions to (1) dismiss for bad faith misconduct, (2) for sanctions and costs and (3) to strike the administrative record and grant de novo review.

## I. Background

In response to a complaint, an inspector for the West Virginia Department of Natural Resources ("DNR") obtained soil samples in September 1984 from property owned by Shaffer Equipment Company ("SEC") on which it operated a mining equipment supply and repair shop. Analysis of the soil samples showed contamination by polychlorinated biphenyls ("PCBs"). SEC conducted its operations on a 1.11 acre parcel in Minden, Fayette County, West Virginia ("parcel"). DNR sought the assistance of the United States Environmental Protection Agency ("EPA") in dealing with the contamination. Thereafter EPA mobilized its contractors and personnel in December 1984 to begin a cleanup of PCBs on and around the parcel. Upon fencing in and securing the parcel, EPA began to remove the contaminated soil. EPA segregated the PCB contaminated soil and transported the soil to a landfill in Emille, Alabama for disposal. EPA also transported PCB contaminated equipment from the parcel. The agency completed the removal of PCBs on December 20, 1987.

During the cleanup, EPA's On–Scene Coordinator Robert E. Caron supervised the implementation of a soil washing technology designed to decontaminate the soil. This soil washing technology, commonly known and referred to in these proceedings as the "solvent extraction method," was implemented on site and involved the use of methanol as a medium for extracting PCBs from contaminated soil. In theory, the sol-

vent extraction method would alleviate the need to transport soil to a landfill for disposal. Caron arranged for O.H. Materials, Inc. to construct a full-scale treatment plant on the parcel to implement the solvent extraction method. The plant began operations in October 1985 but was immediately unsuccessful. On November 21, 1985, Caron ordered that the plant cease operations and that O.H. Materials, Inc. disassemble the plant and remove it from the parcel.

On December 19, 1990, the United States of America ("United States") commenced this action to recover its response costs incurred pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 *et seq* ("CERCLA"). The United States, through EPA, spent in excess of $5 million to cleanup the parcel—$4.022 million for general cleanup and $1.235 million for its activity relating to implementing the solvent extraction method. The Defendants answered the complaint and asserted a host of counterclaims and cross-claims. The parties then engaged in discovery throughout the 1991 calendar year. On December 18, 1991, the Court entered a Time Frame Order requiring the parties to file their summary judgment motions, responses and replies during the period of January 17, 1992 to February 7, 1992. The December 18 Time Frame Order also scheduled this case for trial on March 24, 1992.

The parties timely filed their summary judgment motions. Then on January 31, 1992, Assistant United States Attorney Carol A. Casto filed a motion on behalf of the United States to stay this matter for a period of 60 days. The motion and accompanying letter bear the signature of AUSA Casto. The accompanying letter reads as follows:

Dear Judge Hallanan:

A serious problem has arisen with regard to the testimony of a *material EPA witness* in the above-referenced action. The United States Attorney's office has been advised that an investigation has been commenced by the appropriate gov-

---

1. Defendant Johns Hopkins University has not joined in the motion for costs and sanctions.

ernmental authorities. As a result of the pendency of those investigations and information provided to the United States by counsel for the defendants the United States is unable to proceed in good faith with the litigation of this action until further inquiry is made. We are, therefore, filing the attached Motion for a Stay of all proceedings in this action and respectfully request that the Court allow us a period of sixty days to evaluate this case in light of this information.

Very truly yours,
MICHAEL W. CAREY
United States Attorney
By: /s/
CAROL A. CASTO
Assistant United States Attorney

(emphasis added).

By Order entered February 3, 1992, the Court directed the Defendants to respond to motion for stay on or before February 6, 1992. Upon receiving Defendants' responses, the Court on February 13, 1992 granted the motion to stay in part. The February 13 Order advised the parties that the case would be stayed for a period of 30 days instead of the 60 days requested, as the Court believed that "the United States is well equipped to conduct their investigation in a diligent manner." The same order also directed the United States to advise the Court in writing by March 13, 1992—the end of the stay—as to whether it will continue to prosecute this case. Further, the February 13 Order vacated the Time Frame Order entered December 18, 1991 and continued the March 24, 1992 trial date. Meanwhile, in February the Defendants filed motions to dismiss or, in the alternative, strike the administrative record and grant de novo review. In addition, the Defendants except Johns Hopkins filed

their motions for sanctions and costs on March 10 and 11, 1992.[2]

On March 13, 1992—the final day of the stay—the United States advised the Court in its "Report of the Plaintiff United States of America" of its desire to continue litigating this matter. Five days later on March 18 the Defendants jointly filed their motion to dismiss for bad faith misconduct.[3] Later on April 14, 1992, the Court convened a status conference with lead trial counsel pursuant to an Order entered on April 9, 1992.[4] At the conclusion of the status conference, the Court granted the United States' motion for dismissal of Defendant Berwind Corporation as a defending party[5] and advised lead trial counsel that the Court would convene an evidentiary hearing on the motions to dismiss for bad faith misconduct and for sanctions and costs. On April 16, 1992, the Court entered an Order scheduling the evidentiary hearing for April 28, 1992 and established pretrial deadlines and a trial date of June 30, 1992.

The evidentiary hearing lasted for two days. Aside from several rulings on other pending motions,[6] the hearing largely consisted of direct and cross-examination of counsel in this matter. Finding the allegations and statements contained in the motions to be serious and grave, the Court believed and still believes that the credibility of counsel is at issue and that an evidentiary hearing was the proper means for the Court to ascertain the truth of what transpired in this litigation from September 1991 and January 1992. For these reasons, the Court overruled the objection and denied the request of the United States at the hearing to dispense with the presentation of evidence and have this Court rely on the

**2.** On March 16, 1992, the United States filed a motion to strike the Defendants' motions for sanctions and costs as they were filed during the stay period. By Order entered March 23, 1992, the Court, *inter alia*, denied the motion and directed the United States to file a response on or before March 30, 1992.

**3.** Defendant Johns Hopkins University was not an original party to this motion but has since joined in the motion.

**4.** The status conference was originally scheduled for April 9, 1992 but was rescheduled to April 14 due to a criminal trial.

**5.** Notwithstanding dismissal, Berwind Corporation remains as a party to this case with respect to the motion to dismiss for bad faith misconduct and the motion for sanctions and costs.

**6.** *See* pages 939–40, *supra*.

voluminous record herein in making its rulings.[7]

Central to the motions to dismiss for bad faith misconduct, for sanctions and costs, and to strike the administrative record and grant de novo review is EPA On Scene Coordinator Robert E. Caron. Caron is the "material EPA witness" referred to in AUSA Casto's letter dated January 31, 1992 which accompanied the motion for stay. In general, the Defendants contend that Caron is a perjurer and complete fraud, that the administrative record compiled at his direction is inherently untrustworthy and that counsel for the United States concealed Caron's true colors from this Court and the defending parties while relying on his actions as On–Scene Coordinator in prosecuting this CERCLA cost recovery action. The United States acknowledges that Caron is less than credible, as will be shown below, but vigorously maintains that it was not aware of the Caron's misrepresentations until mid-January 1992 and properly apprised the Court and the Defendants soon thereafter. In turn, the United States contends that it has professionally and properly litigated this matter.

The Court will initially proceed by making its findings of fact for the period of September 1991 through January 1992 which we believe to be the critical time period in connection with the motion to dismiss for bad faith misconduct. Next, the Court will determine whether counsel for the United States violated the Rules of Professional Conduct in its handling of the "Caron problem." Third, we will consider the propriety of dismissal and imposing sanctions and costs against the United States. Fourth, the Court will address the Defendants' motion to strike the administrative record and grant de novo review.

## II. Findings of Fact

On August 23, 1991, counsel for Defendants Berwind Land Company and Berwind Corporation ("Berwind defendants") noticed the deposition of Robert E. Caron to be taken on September 12, 1991 in Philadel-phia, Pennsylvania. As stated earlier, Caron was EPA's On–Scene Coordinator during the cleanup of the subject parcel. Pursuant to an August 16, 1991 directive from the EPA Office of Regional Counsel for Region III, EPA sought to verify the credentials of Caron prior to his deposition. Charles Hayden, EPA Assistant Regional Counsel for Region III, attempted to contact Caron between August 16, 1991 and September 11, 1991 to verify the deponent's educational background. On or about September 11, 1991, Hayden contacted Caron and requested a copy of his college degree. Caron responded that his mother had not mailed to him his degree as promised. Hayden then inquired of the names of the schools Caron attended, the dates of graduation and his social security number in order to independently verify that Caron graduated from college. Caron told Hayden that he received an undergraduate degree from Rutgers University in 1978 and that he had taken courses at Drexel University, Trenton State College and Brookdale Community College. That same day, Hayden attempted to contact Rutgers but was unsuccessful. Yet Hayden was able to contact Rutgers on the morning of the Caron deposition. Hayden learned that Caron attended Rutgers from January 1975 to December 1977 but did not graduate nor earn a degree. Hayden then advised Caron and J. Jared Snyder of the Department of Justice of what he learned. Snyder is a Trial Attorney with the Environmental Enforcement Section of the Environment and Natural Resources Division and serves as lead trial counsel in this case. Snyder was present when Hayden contacted Rutgers. Caron then called Rutgers in the presence of Hayden and Snyder. Caron gave the telephone back to Hayden who was advised by a Rutgers official that Rutgers did not award Caron a degree for failure to pay outstanding fines and debts. After this telephone conversation, Hayden and Snyder advised Caron to testify accurately at his deposition with regard to his academic credentials. Further, Hayden

---

**7.** We note again that the Court advised counsel for the United States at the April 14 status conference that it would proceed with an evidentiary hearing. The United States did not object to this procedure on April 14 or thereafter until the start of the evidentiary hearing.

asked Caron if he had ever testified regarding his academic credentials. Caron responded in the negative and stated that he had only testified to his duties as an EPA employee. Snyder remained present during this response.

The September 12 deposition commenced as scheduled. John H. Tinney, lead counsel for the Berwind defendants, examined Caron. After establishing Caron's full name, address and present employment, Tinney inquired of Caron's education:

Q. What is your educational background beginning with high school, please?

A. High school, graduated in New Jersey. Completed all the requirements for environmental science degree from Rutgers. Close to matriculating that.

Q. When did you get that degree?

A. Still working that out. Completed the degree requirements.

Q. Do you, in fact, have a degree?

A. We are checking with the university now. It is in the matriculation problem. Paperwork. It was fourteen years ago so.

Q. As I understand it—

A. '78.

Q. As I understand it, you last attended Rutgers University in 1978?

A. That is correct.

Q. When you last attended Rutgers University in 1978, you were not awarded a degree, a bachelor's degree?

A. That is correct.

Q. Since that time, you have—

A. Taken many other colleges—college courses which is a function of matriculating a degree.

Q. Explain to me how it works?

A. Submit what—you would call it transcripts and then them doing their paperwork.

Q. Have these classes been taken at Rutgers University?

A. No. Several other locations; Drexel University, Brookdale Community College and Trenton State College.

Q. Is this in the nature of you taking these classes at other institutions then you have assembled your transcripts and, in effect, petitioned Rutgers to consider that the completion of your—

A. That's correct.

Q. —degree requirements?

A. That's correct.

Q. That has been going on since 1978?

A. Yeah, I'm seeking a Master's, so a lot more college work since then.

Q. But, again, so that I am not misunderstanding something, you are seeking a Master's but you have not attained a bachelor's?

A. Right. Have to do that first which is a paperwork exercise so I can then matriculate the Master's degree.

Q. In what field is the bachelor's degree that you are seeking?

A. Environmental science.

Q. And the Master's?

A. Organic chemistry.

(Caron deposition, Volume I, pp. 6–9).

Caron further testified that he went to work for EPA in 1984 and that he appeared as a government witness in two federal district court cases. Near the end of the day, Tinney reserved the right to reconvene the deposition to ask further questions based on the production of additional documents by the United States. The Caron deposition continued on into the next day, September 13, 1991, and reconvened in Philadelphia on November 27, 1991.

When the Caron deposition reconvened on November 27, Snyder stated on the record that Tinney's further inquiry was limited to questions based on additional documents produced since September 12 in accordance with the aforementioned reservation of rights. Tinney responded that he would continue the deposition in accordance with the November 19, 1991 Order entered by the Honorable Charles T. Cunningham, United States Magistrate Judge. Said Order denied a protective order motion of the United States and acknowledged the propriety of discovery of relevant evidence in this case.[8]

---

**8.** We affirmed this ruling by the Magistrate Judge in an Order entered December 6, 1991.

Tinney proceeded to uncover a new fact of Caron's employment history. Caron admitted on November 27 that he left EPA in May 1988 and went to work for Guardian Environmental Services, Inc. ("Guardian") until August 1989 when he returned to EPA. Tinney then presented Caron a copy of the professional resume the deponent submitted with his application to Guardian.[9] The resume was marked as Exhibit 1. Snyder resisted any questioning of Caron's educational background on the grounds that Tinney had previously covered this area of inquiry on September 12 and that Tinney's questioning was inconsistent with his reservation of rights to continue the deposition. When Tinney questioned Caron on the contents of his resume, Snyder directed Caron not to answer despite having personal knowledge that Caron did not in fact have a college degree:

BY MR. TINNEY:

Q The professional profile that's been marked for identification as Deposition Exhibit No. 1 indicates, does it not, Mr. Caron, that you hold a B.S. environmental science degree from Rutgers University and a M.S. organic chemistry degree from Drexel University?

MR. SNYDER: I direct him not to answer.

BY MR. TINNEY:

Q That is not a factual statement, is it, Mr. Caron?

MR. SNYDER: I direct him not to answer.

BY MR. TINNEY:

Q That is a false statement, isn't it, sir?

MR. SNYDER: Direct him not to answer.

(Caron deposition, Volume III, pp. 14–15). Snyder then threatened to terminate the deposition on the basis that Tinney's questions were not proper and that they were a waste of time. Tinney disagreed contending that Caron's credibility is at issue in this action as he had previously testified under oath that he did not have a college

degree yet has held himself out to the public as having one. Snyder maintained his original position that Tinney reserved his right to continue the deposition based on production of additional documents by EPA and stressed that the document production did not cover Caron's education. Tinney countered by pointing out that he discovered Caron's employment with Guardian after September 13 in another deposition and that the November 19 Order of Magistrate Judge Cunningham permitted the discovery of relevant matters which includes the credibility of Caron.

Robert A. Lockhart, co-counsel for Defendant Johns Hopkins University, suggested that counsel contact Magistrate Judge Cunningham for a ruling to resolve this dispute. Snyder suggested that the deposition continue in the areas agreed on and announced that he would contact AUSA Casto for her thoughts on the matter. After a recess, Snyder noted his conversation with AUSA Casto and indicated that the United States would permit Tinney to inquire of Caron's educational background, despite the fact that it was not covered on September 12 and 13, but that the United States would note its objections for the record. Snyder then requested that Tinney make available in advance those documents that Tinney would use in questioning Caron. Tinney provided such documents to Snyder just before the lunch recess at 11:30 a.m. so that Snyder could review them with Caron over lunch. As noted above, the resume was marked as Exhibit 1. The other documents were marked as Exhibits 2, 3, 4, 5, 6 and 7 and included a personnel change notice, Guardian's offer of employment, a confidentiality and non-competition agreement, job description, Caron's letter of resignation from Guardian dated August 3, 1989 and an in-house report documenting Caron's resignation.

At around noon, Snyder called his immediate supervisor at the Department of Justice, William A. Hutchins. Like Snyder,

**9.** This document is entitled "Professional Profile" and is one of seven documents counsel for the Berwind defendants obtained from Guardi-

an Environmental Services, Inc. via a subpoena duces tecum. The subpoena duces tecum produced Caron's personnel file.

Hutchins is a Trial Attorney in the Environmental Enforcement Section of the Environment and Natural Resources Division. Snyder explained to Hutchins that Tinney had attempted to question Caron that morning about the resume he included in his application for employment with Guardian. Snyder also explained that the statements in the resume regarding bachelor's and master's degrees were contrary to Caron's earlier deposition testimony that he did not have a college degree. Snyder made it clear to Hutchins that the deposition was in recess and that Caron had not yet given testimony. Snyder also told Hutchins that Caron's earlier deposition testimony was correct and that the resume was not. Snyder inquired of Hutchins as to how to proceed. Hutchins told Snyder to call back before the deposition resumed.

Hutchins then spoke to his immediate supervisor, Bruce Gelber, who serves as Assistant Section Chief in the Environmental Enforcement Section. Hutchins conveyed the details of his conversation with Snyder to Gelber. Gelber in turn called Michael F. Vaccaro, Deputy Regional Counsel of EPA for Region III. Gelber explained the Caron situation to Vaccaro with Hutchins present. Snyder then called for Hutchins. Hutchins took the call in Gelber's office. The Gelber–Vaccaro and Hutchins–Snyder conversations continued. Eventually, Hutchins instructed Snyder to (1) advise Caron that he (Snyder) could not represent him with respect to questions about the resume and that Caron might want to consult his own counsel before answering such questions and (2) not to instruct Caron not to answer such questions but state for the record any objections appropriate to the questions posed. Snyder agreed to the instructions. Gelber advised Hutchins that Vaccaro, as EPA Deputy Regional Counsel, would look into Caron's academic credentials.

The deposition resumed at 1:22 p.m. Below is how the afternoon session began:

MR. SNYDER: Over the break we looked over the documents you produced to us, and I can't see any possible relevance of those documents in this case. If we had known that you were going to be using this deposition to make a personal attack on Bob Caron as opposed to trying to find relevant evidence, trying to find out what happened in this case, Bob would have had the opportunity to consult with his own lawyer, a lawyer to represent him in personal matters.

He hasn't had that opportunity, and we don't think you should go forward with any kind of questioning regarding these documents until he's had that opportunity.

I am here as counsel for the United States. To the extent Bob performed acts for the United States, I represent him. I don't represent him as an individual. He is not represented as an individual here.

The matters revealed by the documents you produced are irrelevant to any issues in this litigation. It looks like you're trying to impeach him on completely collateral issues, matters that have nothing to do with this litigation. *There is no foundation to any questions relating to his credibility. In fact, I don't even think his credibility is an issue in any way.*

That said, we would like to request that you not subject Bob to questioning at this time about any of those documents until he's had an opportunity to speak with a personal lawyer.

MR. TINNEY: First of all, let me respond. I believe in the interest of fair play, which was your term that you used earlier today, we were scheduled to reconvene this deposition at one o'clock this afternoon. You have returned to the deposition room at approximately 1:20. You have previously advised me that this deposition would end at four o'clock. If fair play is a level playing field, then I suggest that this deposition be extended to at least 4:20. Do we have that agreement?

MR. SNYDER: I'm not making any agreement as far as that goes.

MR. TINNEY: Then fair play is a one-way street with you, isn't it, Mr. Snyder?

MR. SNYDER: Do you have anything else to say?

MR. TINNEY: Yes, I have quite a bit else to say.

MR. SNYDER: Then why don't you.

MR. TINNEY: You're not agreeing to extend the deposition for 20 minutes?

MR. SNYDER: Not at this time.

MR. TINNEY: And the record will reflect—

MR. SNYDER: That doesn't mean I'm disagreeing either. I'm not the person to make that decision. If you want me to go outside and consult with everyone else, I will, but I would suggest you make the rest of your statements for the record.

MR. TINNEY: Then I'm going to ask you to do that, as to whether or not there is your suggestion that fair play be a two-way street.

Now for the rest of the record, any suggestion by you that Mr. Caron's credibility is not an issue in this case flies in the face of the obvious. This witness produced by the Government to testify against defendants, his credibility is a critical issue in this case. We have come into information that Mr. Caron published to the world, knowingly published to the world falsehoods so that he might obtain—

MR. SNYDER: I object to your statements on the record about what Bob has or has not done. That is completely unfair to make those statements on the record at this point.

MR. TINNEY: Fine. I'm going to take it up with the Court. You can move to strike it from the record.

This man has testified under oath, if he has any understanding of the sanctity of an oath to tell the truth, that he does not have any degree, he has no college education—

MR. SNYDER: Objection. He has not testified that he has no college education. The record will speak for itself. Will you quit lying for the record? Quit harassing this witness.

(Caron deposition, Vol. III, pp. 107–111, emphasis added).

Notwithstanding this heated exchange, the parties agreed to extend the deposition twenty minutes and Tinney moved on to other areas of inquiry. Later on after a recess, Caron stated that he wished to take Tinney's questions concerning his academic credentials without private counsel while reserving the right not to answer a question if he felt that he should consult legal counsel before answering. Tinney declined the invitation so as to avoid any appearance of taking advantage of Caron in questioning him without the benefit of first consulting an attorney. After consulting with other counsel off the record, Tinney stated that the Defendants would take Caron's offer to testify under advisement as they were undecided. Tinney then continued his inquiry of Caron in other areas. At the conclusion of Tinney's examination of Caron, Snyder again stated that Caron's academic credentials were irrelevant to this litigation. Snyder continued:

Bob has very important responsibilities with EPA and I think it's an improper use of discovery and waste of his time to spend his time testifying about irrelevant matters.

(Caron deposition, Volume II, p. 242). After Lockhart examined Caron, the deponent reiterated his offer to take questions from Tinney concerning his academic credentials subject to the same reservation noted above. Tinney again declined the offer in order to avoid the appearance of improperly taking advantage of Caron.

Following the November 27 deposition Caron reviewed the transcript of his testimony. Attached to the transcript were Exhibits 1–7. Caron removed the exhibits from the transcript and made the following notation on the errata sheet:

Removal of Exhibits 1–7 as irrelevant since no testimony was given in this area. This action taken upon the advice of counsel.

REC

(Caron deposition, Volume III, p. 235). Meanwhile, Snyder proceeded to research whether Caron's credibility is relevant to this litigation. On November 29 Snyder concluded that Caron's credibility was rele-

vant as a matter of law.[10] Previously, Snyder objected to interrogatories propounded by the Defendants concerning the academic background and qualifications of Caron and other EPA employees on relevance grounds. Despite learning that Caron's credibility was relevant to the prosecution of this CERCLA cost recovery action, Snyder failed to supplement his interrogatory objection or withdraw his objection altogether.

On or about December 1, EPA Deputy Regional Counsel Vaccaro began to investigate Caron's academic credentials. Vaccaro advised Hayden in early December 1991 that EPA was investigating Caron's credentials and not to disclose this fact to anyone. Vaccaro specifically told Hayden that there were discrepancies in Caron's federal employment applications, commonly known as Standard Forms 171 ("SF–171s"), concerning his academic credentials. Thereafter Hayden shared this information with Snyder in early December. Meanwhile, Vaccaro advised Hutchins of the EPA investigation and Caron's inconsistencies in his SF–171s. Vaccaro also mentioned to Hutchins that Caron claimed in a deposition in *FMC Corporation v. United States of America* (E.D.Pa.) ("*FMC*") that he had a master's degree. Hutchins relayed this information to Gelber. On or about December 10, 1991, Vaccaro contacted the EPA Region III Office of the Inspector General ("OIG") in Philadelphia to advise that office of the Caron situation. That office opened an official criminal investigation of Caron on December 19. The OIG criminal investigation was separate from the EPA investigation initiated by Vaccaro. Hutchins was made aware of Vaccaro's contact with OIG. On December 17 Vaccaro met with Caron to apprise him generally of the agency's concerns over the discrepancies in his credentials and the overall seriousness of the matter. Specifics were not discussed.

While EPA conducted its investigation in December, the agency provided Gelber a list of Superfund sites in which Caron participated in cleanup activities. Gelber presented the list to Hutchins in mid-December. Hutchins reviewed the list and determined that the Environmental Enforcement Section was involved in litigation concerning six of the Superfund sites listed. Hutchins shared this information with Gelber and, with Gelber's concurrence, advised the Environmental Enforcement Section attorneys handling the six cases that EPA was investigating Caron's academic background and possible false statements concerning his education. Hutchins instructed the attorneys (1) not to cite Caron's testimony in their case until the completion of the EPA investigation and (2) not to disclose the existence of the investigation outside of the Department of Justice so as to avoid prejudicing the investigation or violating Caron's privacy rights, and (3) to give him copies of all sworn statements made by Caron in their cases which he would forward to EPA to assist in the agency's investigation.

Snyder received Hutchins' instructions set forth above inasmuch as he is lead trial counsel for the United States in this matter. Accordingly, Snyder in mid-December provided Hutchins a copy of Caron's deposition in this case and two affidavits. Furthermore, Snyder then prepared a motion for summary judgment and a memorandum of law in support. Pursuant to Hutchins' instructions, Snyder did not cite testimony of Caron or include an affidavit by Caron. The summary judgment motion and memorandum addressed the claims of the United States against all of the Defendants except Berwind Corporation. Sometime during December, Hutchins reviewed the motion and memorandum prepared by Snyder. The dispositive motion was premised on the administrative record compiled during the cleanup of the parcel. Caron played a significant role in the preparation of documents contained in the administrative record. However, Snyder did not file the motion and memorandum at this time.

---

**10.** We make this finding of fact as a result of the testimony at the hearing. Prior to the hearing, the record did not support such a finding.

By the end of December 1991 Vaccaro determined that a second interview with Caron was necessary as part of the EPA investigation. Hutchins and Gelber asked Vaccaro to advise them of the results of the interview. Vaccaro interviewed Caron on January 8, 1992 and questioned him extensively about his academic credentials. Caron admitted to Vaccaro that he did not complete all of the requirements for a bachelor's degree at Rutgers and that he had not enrolled at Drexel University. Caron also denied making a statement during a deposition in *FMC* that he has a master's degree from Drexel. Afterwards Vaccaro advised Hutchins that Caron made such a denial. While Vaccaro interviewed Caron on January 8, Snyder met with counsel for the Defendants at a stipulation conference. At no time during the conference did Snyder reveal to other counsel the ongoing EPA investigation of Caron. On January 10, EPA reassigned Caron from his position as On–Scene Coordinator to other duties.

Meanwhile, in early January, an OIG Special Agent contacted Hutchins and advised him of a criminal investigation of Caron. Hutchins in turn notified Snyder of the criminal investigation.[11] The OIG Special Agent also requested copies of statements made by Caron. Hutchins advised the agent that he would furnish the copies upon receipt of a written request. Hutchins later received such a request and on or about January 21 provided copies of the three volume deposition in this case and two affidavits. One of the affidavits was submitted in the *FMC* case in which Caron stated that he received a bachelor's degree from Rutgers in environmental science and a master's degree in organic chemistry from Drexel. The other affidavit stated that Caron had completed the requirements for a bachelor's degree in environmental science from Rutgers and had nearly completed the requirements for a master's degree in organic chemistry from Drexel. Aside from advising Snyder, Hutchins virtually remained silent about the OIG criminal investigation. Neither the Court nor

the Defendants were advised of the criminal investigation. Having closely worked with Caron in other cases, Hutchins was concerned for the reputation of Caron, a much heralded EPA employee, and did not want to turn against him. Additionally, Hutchins believed that disclosure of the criminal investigation might result in Caron tampering with potential witnesses and interference by Department of Justice attorneys who are not experienced investigators.

As the EPA and criminal investigations of Caron were underway, Carl L. Fletcher, Jr., co-counsel for the Berwind defendants, subpoenaed records from Rutgers, Drexel, Trenton State College and Brookdale Community College on or about January 7. The subpoenas targeted official transcripts of Robert Caron. On January 10 Snyder learned of the subpoenas via certificates of service. Snyder immediately telephoned Fletcher and objected to the subpoenas on the ground that the Berwind defendants were conducting discovery beyond the discovery cutoff of December 31. Snyder also expressed concern that the subpoenas were possibly in violation of Caron's privacy rights. Snyder followed the conversation with a letter to Fletcher dated January 13 in which he requested the Berwind defendants to withdraw the subpoenas and return any documents obtained. At no time did Snyder apprise the Court of his objection to the subpoenas as improper discovery.

Drexel received its subpoena and notified Fletcher that it had no records concerning Caron. Fletcher then called Snyder with this information. This conversation triggered the following letter, delivered Federal Express, dated January 17, 1992 from Snyder to Fletcher:

Dear Carl:

Thank you for advising me of information you have obtained which you suggest may indicate that Robert Caron's deposition testimony with regard to his educational background may be misleading or inaccurate. We are looking into

11. We make these two findings of fact as a result of Hutchins' testimony at the hearing.

the matter and will let you know if Mr. Caron's testimony requires correction.

Sincerely,

/s/

J. Jared Snyder

Apparently, Snyder originally drafted this letter to disclose the ongoing criminal investigation of Caron. However, Hutchins and Gelber agreed that any reference to the criminal investigation should be deleted to protect the confidential nature of that investigation and therefore instructed Snyder to delete such a reference. Snyder complied with the instruction.

In addition to his letter to Fletcher, Snyder on January 17 filed the United States' Motion for Summary Judgment and memorandum in support that he prepared the month before.[12] January 17 was the deadline for the filing of summary judgment motions. Per Hutchins' earlier instructions, the motion did not cite testimony of Caron nor include an affidavit of Caron. Yet, as noted above, the motion was premised on the administrative record compiled during Caron's tenure as On–Scene Coordinator. Hutchins and Gelber approved the filing of the motion and the memorandum. Neither the motion nor the memorandum apprise the Court of Caron's statements regarding his academic credentials or the fact that Caron was under both an EPA civil investigation and a criminal investigation.

Snyder went on vacation from January 18 through January 25. During that week, Fletcher advised Snyder's colleague, Leslie Hulse, that counsel for the Berwind defendants learned of Caron's criminal trial testimony in *United States of America v. Virgil Cummings* (D.Md.) in March 1988.[13] During the *Cummings* trial, Caron testified that (1) he had a bachelor's degree in

environmental science, (2) a master's degree in organic chemistry from Drexel and (3) wrote his master's thesis on the use of photoionization meters and the gas photomacrograph. Hulse then advised Hutchins of Caron's testimony in *Cummings* and informed Snyder of the same when Snyder called on January 26 to check on the status of this matter. On January 29 Robert G. McLusky, co-counsel for Defendant Johns Hopkins University, approached AUSA Casto concerning Caron's testimony in *Cummings*. AUSA Casto and Snyder conferred later that day at which time AUSA Casto learned for the first time of the ongoing criminal investigation of Robert Caron. By the afternoon of January 30, AUSA Casto, Hutchins and Snyder agreed that a motion for stay was in order.[14] The Court received the motion for stay the following day signed by AUSA Casto.

EPA placed Caron on administrative leave on February 10. Caron resigned from EPA on February 21 with an effective date of March 10. Recently on June 2, 1992, the United States Attorney for the District of Maryland filed an information against Caron charging him with making false material declarations during the *Cummings* trial in violation of 18 U.S.C. § 1623.

### III. Discussion

#### A.

The Defendants move the Court to dismiss this action for bad faith misconduct on the part of counsel for the United States in failing to apprise the Court and the Defendants of Caron's misrepresentations of academic credentials and the resulting civil and criminal investigations. The Defendants submit that the failure of the United States to come forward is a direct violation

---

**12.** As noted above, the summary judgment motion addressed the claims of the United States against all of the defending parties except Defendant Berwind Corporation.

**13.** The United States prosecuted Virgil Cummings for violating 18 U.S.C. §§ 2 and 371 and 42 U.S.C. §§ 6928(d)(1) and (d)(2)(A) in transporting hazardous materials across state lines. The United States called Caron as a witness at trial to establish that the material transported

by Cummings was a hazardous substance. Cummings was convicted by a jury of his peers and later incarcerated and fined.

**14.** Hutchins at Paragraph 18 of his Declaration states that a stay in proceedings was sought so that the United States could reassess its position in this matter in light in view of the Caron problem.

of the Rules of Professional Conduct[15] ("Rules") and is worthy of a dismissal sanction. More specifically, the defending parties argue that counsel for the United States has violated its duty of candor to this Court as set forth in Rule 3.3(a)(2) of the Rules.[16] Said rule reads as follows:

> **RULE 3.3 Candor Toward Tribunal**
>
> (a) A lawyer shall not knowingly:
>
> (2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client.

West Virginia Code Court Rules (1992).

■ An attorney is under a high fiduciary duty to fairly represent his client but he or she owes substantial duties to the court and the public as well. *Hirschkop v. Snead*, 594 F.2d 356, 366 (4th Cir.1979). An attorney does not simply act as an advocate for his client for he or she is an officer of the court and, accordingly, has a duty of good faith and candor in dealing with the judiciary. *United States v. Associated Convalescent Enterprises, Inc.*, 766 F.2d 1342, 1346 (9th Cir.1985). Moreover, an attorney has a continuing duty to inform the Court of any development which may conceivably affect the outcome of litigation. *Board of License Commissioners of the Town of Tiverton v. Pastore*, 469 U.S. 238, 240, 105 S.Ct. 685, 686, 83 L.Ed.2d 618 (1985), citing *Fusari v. Steinberg*, 419 U.S. 379, 391, 95 S.Ct. 533, 540, 42 L.Ed.2d 521 (1975) (Burger, C.J., concurring). This continuing duty exists even when new developments or new facts may be unfavorable to the interests of the litigant. *United States v. De Le Puente*, 755 F.2d 313, 315 (3rd Cir.1985) (referring to Rule 3.3 of the Model Rules of Professional Conduct concerning candor toward tribunal). Thus, at-

torneys are expected to bring directly before the Court all those conditions and circumstances which are relevant in a given case. *Pridemore v. Rural Legal Aid Society of West Central Ohio*, 625 F.Supp. 1180, 1185 (S.D.Ohio 1985). Caron's misrepresentations of his academic credentials and the resulting civil and criminal investigations are relevant and material to this litigation in light of Caron's active role as EPA's On–Scene Coordinator and his contributions to the administrative record.[17] In determining whether counsel for the United States fulfilled its duty of candor to this Court, we shall examine the conduct of Snyder and Hutchins during the period September 1991—January 1992.

### 1. J. Jared Snyder

■ Snyder was present during the entire deposition questioning of Caron on September 12 and 13 and November 27. This DOJ Trial Attorney learned that Caron did not have a college degree on September 12. When counsel for the Berwind defendants introduced Caron's resume on November 27, Snyder initially instructed Caron not to answer questions of counsel and took the position that Caron's credibility was irrelevant. On November 29 Snyder reversed his position on the relevance of Caron's credibility by virtue of his independent research. Yet he failed to modify or withdraw his interrogatory objection on this question or at least notify other counsel and the Court of his change in position. In this connection, Snyder violated his duty to supplement imposed by Rule 26(e)(2) of the Federal Rules of Civil Procedure. Moreover, his failure to advise the Court after November 29 that Caron's credibility was

---

**15.** The Rules of Professional Conduct were promulgated and adopted by the Supreme Court of Appeals on June 30, 1988, effective on and after January 1, 1989. Pursuant to Local Rule 1.03(h), counsel who appear in this district are required to conduct themselves in accordance with these rules.

**16.** The Defendants also charge counsel for the United States with violating Rule 3.1 (meritorious claims and contentions), Rule 3.4 (fairness to opposing party and counsel) and Rule 4.1 (truthfulness in statements to others).

**17.** Our belief is supported by the hearing testimony revealing that Snyder, following the November 27, 1991 deposition of Caron, researched whether Caron's credibility was relevant and answered this question in the affirmative. *See* pp. 946–47, *supra.* Also, the United States' letter of January 31 accompanying the motion for stay refers to Caron as a "material EPA witness." It is apparent to the Court that the United States concedes that Caron is material to their case.

relevant was in violation of the duty of candor rule.

In early December 1991 Snyder learned from Hayden that there existed discrepancies in Caron's SF–171s regarding his academic credentials and that EPA was investigating Caron's credentials. About a month later Snyder learned from Hutchins of the OIG criminal investigation of Caron. Nevertheless, Snyder continued to litigate this matter unabated without disclosing the investigations to the Court. In December he prepared the motion for summary judgment and memorandum in support. On January 8 he met with other counsel for a stipulation conference but never disclosed that Caron was under a civil or criminal investigation. Two days later on January 10 he strongly objected to the subpoenas for records prepared by Berwind counsel claiming that the discovery period had passed. Yet Snyder did not apprise the Court of his objection. Had he done so, the Court upon inquiry into the matter would have necessarily learned of the Caron deposition, Caron's testimony and his resume such that it would have been incumbent upon the United States to advise the Court of the ongoing investigations to fulfill its duty of candor.[18] Then on January 17 Snyder filed the motion for summary judgment and the memorandum in support without disclosure or reference to the investigations of Caron. We view this conduct of Snyder as a clear violation of the duty of candor. The Court finds it incredible that counsel would move the Court to adjudicate the merits of this matter before trial while intentionally concealing the civil and criminal investigations of a material witness whose actions are relied upon in prosecuting the case.[19] We note also that Snyder's letter of the same date to Fletcher is less than candid in that it fails to affirmatively disclose the ongoing investigations to the Defendants.

### 2. William A. Hutchins

Turning to Snyder's immediate supervisor, we find his conduct amounts to an egregious violation of the duty of candor and is perhaps more severe in comparison to Snyder. On November 27 Hutchins learned from Snyder that Caron did not have a college degree and that his resume stated otherwise. In early December Vaccaro advised Hutchins of the EPA investigation and of Caron's testimony in *FMC* that he had a master's degree. Not long thereafter Hutchins learned that Vaccaro approached the Office of Inspector General concerning Caron's academic credentials. Then in early January the OIG Special Agent contacted Hutchins and advised him of the criminal investigation. Thus, by early January, Hutchins knew of both investigations of Caron. However, like Snyder, Hutchins continued on in his participation in this litigation without advising the Court of the ongoing investigations thereby breaching his duty of candor. He approved the filing of the summary judgment motion which was filed on the deadline date of January 17. In addition, he instructed Snyder in the January 17 letter to Fletcher not to disclose the fact that Caron was under investigation. Furthermore, Hutchins committed another violation of the duty of candor rule by failing to make proper disclosure of Caron's misrepresentations in two other federal court cases. Hutchins possessed actual knowledge of Caron's falsification of academic credentials on or about January 21 when he forwarded two Caron affidavits to the OIG Special Agent.[20] In both affidavits, Caron stated that he had a bachelor's degree. In one of them, submitted in the *FMC* case, Caron stated that he had a master's degree. Hutchins fully knew that these statements by Caron were inaccurate yet did nothing to call these statements to the Court's attention. We view this concealment by Hutchins as a willful breach of his duty of candor to the Court in bad faith.

Overall, it is clear to the Court from the record herein that counsel for the United States has deliberately placed its loyalty

---

**18.** *See* citations at p. 950, *supra*.

**19.** The statement applies to Hutchins as well. *See* discussion *infra*.

**20.** *See* page 948, *supra*.

and allegiance to its agency client (EPA) and client's servant (Robert Caron) far and above the unending duty of candor owed to this Court. Such conduct is reprehensible and lies in bad faith.[21] Mindful of this, we now consider the propriety of dismissal and imposing sanctions and costs upon the United States.

### B.

■ The Defendants jointly move the Court to exercise its inherent power to dismiss this action in its entirety for bad faith misconduct by opposing counsel. The inherent powers of federal courts are those which "are necessary to the exercise of all others." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980), quoting *United States v. Hudson*, 7 Cranch 32, 34, 3 L.Ed. 259 (1812). For this reason, federal courts are universally acknowledged to be vested by their creation with power to impose silence, respect, decorum and submission to their lawful mandates. *Chambers v. NASCO, Inc.*, — U.S. —, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991), citing *Anderson v. Dunn*, 6 Wheat. 204, 227, 5 L.Ed. 242 (1821). The scope of the inherent power of federal courts includes the power to control admission to its bar, power to discipline attorneys who appear before it, power to punish for contempt, powers to conduct independent investigation to determine if the court has been the victim of a fraud and to vacate its own judgment upon proof of fraud perpetrated upon the court, power to bar a criminal defendant from the courtroom who disrupts a trial, power to order outright dismissal of a lawsuit and power to assess attorney's fees against counsel. *Chambers*, 111 S.Ct. at 2132–2133 (citations omitted). In light of their potency and their freedom from democratic controls, inherent powers must be exercised with restraint and discretion. *Roadway, supra*. A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process. *Chambers, supra*. The inherent power of a federal court is so broad such that the power may be invoked even if rules and statutes exist which sanction the same conduct. *Id.* at 2135.

The Defendants specifically request that the Court invoke the final two powers recited above. While we are mindful of the inherent power to dismiss, we also need to consider (1) the degree of personal responsibility of the Plaintiff, (2) the amount of prejudice caused the Defendants, (3) the presence or absence of a drawn out history of misconduct and (4) the effectiveness of sanctions less drastic than dismissal. *See Davis v. Williams*, 588 F.2d 69, 70 (4th Cir.1978) (criteria to be applied by district court in determining the propriety of dismissing action with prejudice *sua sponte* under FRCP 41(b)). As to the first consideration, we do not look to the actions or inactions of counsel. Instead, we look to the actions or inactions of the client—EPA. The record is clear that the EPA attorneys involved in this matter, Charles Hayden and Michael Vaccaro, *never disclosed* to the Court the statements made by Robert Caron as well as the resulting civil and criminal investigations.[22] In this connection, Hayden and Vaccaro, as officers of this Court acting on behalf of EPA, violated their duty of candor to this tribunal. Proper disclosure by the agency client would have fulfilled the duty of candor. As there was none, the agency client will be held to the highest degree of personal responsibility for breach of the duty of candor.

Secondly, the Defendants have been subject to considerable prejudice due to the breach of the duty of candor by opposing counsel. By virtue of the silence and concealment of the Caron statements and investigations, the United States has been

---

21. Our finding of bad faith is expressly limited to counsel for the United States and their conduct in this particular matter. We do not impute our finding of bad faith in any general sense to the Department of Justice or its Environmental and Natural Resources Division.

22. It is clear to the Court that Hayden knew of the EPA civil investigation in early December. However, we cannot determine precisely when Hayden learned of the OIG criminal investigation.

less than evenhanded in the prosecution of their CERCLA cost recovery action. The Defendants have necessarily litigated this matter without the benefit of material information concerning a critical witness for the opposition. It was the Defendants themselves, namely the Berwind defendants, who caught on to Caron's misrepresentations of his academic credentials and brought the same to the Court's attention. In so doing, they had little choice but to protract this litigation at additional expense in a different direction. Clearly, dismissal of this matter with prejudice would relieve the Defendants of a potential liability in excess of $5 million and preclude the Superfund from recovery of monies previously expended. *Yet there is no price tag that comes with the duty of candor charged by the courts and the applicable rules of professional responsibility.* Nor will this Court assign such a price. The duty of candor is as priceless as it is ageless, it is a monumental constant within the practice of law and will thrive so long as it is enforced. I will enforce the duty of candor without reservation. To do otherwise would serve to compromise the integrity of this Court, our system of justice and our nation.

Thirdly, the misconduct of counsel for the United States in violating the duty of candor is not a single isolated occurrence but rather a series of actions over several months. As discussed above, Snyder first violated his duty of candor at the end of November 1991 in failing to apprise the Court of his change in position on the question of the relevance of Caron's credibility. Thereafter Snyder and Hutchins individually violated their respective duties of candor through litigating this matter as if nothing happened and failing to make proper disclosure to the Court. The fact that counsel chose not to disclose the "Caron problem" to the Court strongly suggests a lack of trust in this Court to competently address sensitive matters such as federal investigations and preserve the confidences of counsel. Such a lack of trust is wholly undeserving and insulting to this Court.

Finally, we believe dismissal with prejudice to be the only sanction available that is commensurate with the duty of candor violations by counsel. In its Report filed with the Court on March 13, 1992, the United States is amenable to (1) de novo review of the administrative record with respect to the selection of the solvent extraction method, (2) discovery by the Defendants on EPA's selection of the solvent extraction method and (3) discovery on any and all matters involving Caron. The Court, however, finds these concessions by the United States to be a self-serving means to save face in this litigation. Moreover, adopting these concessions would amount to imposing a rather slight sanction upon the United States for counsel's violation of the duty of candor. Even if the United States conceded to *de novo* review of the entire administrative record, we would make an identical determination. The conduct of counsel for the United States in violating the duty of candor has been most egregious and disturbing. Such conduct is worthy of sanction and must also be deterred. Dismissal with prejudice accomplishes these dual aims. Involuntary dismissal, though harsh and severe, is available to district courts to not only penalize improper conduct but also to deter others "who might be tempted to such conduct in the absence of such a deterrent." *Nat'l Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747 (1976). Today we will send a message to all counsel who appear before this Court that the duty of candor will be upheld and preserved at all times irrespective of the identity of the parties and the monetary stakes in the litigation.

■ Moving to the assessment of attorney's fees, it is beyond dispute that federal courts have the inherent power to assess attorney's fees when a losing party has acted in bad faith. *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975). However, it is not necessary to invoke this inherent power in lieu of the Equal Access to Justice Act ("EAJA"), codified at 28 U.S.C. § 2412, which provides for an award of costs and "reasonable fees and expenses of attorneys" to a prevailing

party in a civil action brought by or against the United States. Congress through the EAJA has waived sovereign immunity and has rendered the United States liable for costs and attorney's fees and expenses to the same extent as any private party. 28 U.S.C. § 2412(b). As the Defendants have prevailed on the joint motion to dismiss for bad faith misconduct, the Court deems the individual defending parties to be prevailing parties in this litigation. Upon receipt of an itemized listing of attorney's fees and costs from the Defendants and review of any written response by the United States, the Court will make an appropriate award of *reasonable* attorney's fees and costs consistent with the EAJA.

## IV.

Accordingly, for reasons heretofore stated, Defendants' joint motion to dismiss for bad faith misconduct and Defendants' motion for sanctions and costs are hereby ORDERED GRANTED. Therefore, Defendants' motion to strike the administrative record and grant de novo review is hereby ORDERED DENIED AS MOOT. An appropriate judgment order shall issue.

Finally, the Defendants are hereby ORDERED to individually file a detailed, itemized listing of their attorney's fees and costs on or before July 6, 1992. The United States is ORDERED to file any written response on or before July 13, 1992.

IT IS SO ORDERED.