**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**SHAFFER EQUIPMENT COMPANY; Anna Shaffer; Berwind Land Company; Berwind Corporation; The Johns Hopkins University, Defendants–Appellees. (Two Cases)**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**BERWIND LAND COMPANY; Berwind Corporation, Defendants–Appellants,**

and

**Shaffer Equipment Company; Anna Shaffer; The Johns Hopkins University, Defendants.**

**Nos. 92–2024, 93–1007, and 93–1049.**

United States Court of Appeals,
Fourth Circuit.

Argued May 4, 1993.

Decided Dec. 9, 1993.

452

John Alan Bryson, U.S. Dept. of Justice, Washington, DC, argued (Vicki A. O'Meara, Myles E. Flint, Acting Asst. Attys. Gen., Roger Clegg, Deputy Asst. Atty. Gen., Ellen M. Mahan, U.S. Dept. of Justice, William A. White, Enforcement Counsel, Lisa Friedman, Associate Gen. Counsel, Marcia E. Mulkey, Regional Counsel, U.S.E.P.A., on the brief), for plaintiff-appellant.

John Hampton Tinney, Spilman, Thomas, Battle & Klostermeyer, Charleston, WV, argued (Carl L. Fletcher, Jr., Robert A. Lockhart, Allyn G. Turner, Spilman, Thomas, Battle & Klostermeyer, for appellees Berwind Corp. and Berwind Land Co.; Johnnie E. Brown, Cynthia M. Salmons, McQueen & Brown, L.C., for appellees Shaffer Equipment and Anna Shaffer; Robert G. McLusky, Patrick W. Pearlman, Jackson & Kelly, for appellee Johns Hopkins, on the brief), for defendants-appellees.

Before ERVIN, Chief Judge, and PHILLIPS and NIEMEYER, Circuit Judges.

## OPINION

NIEMEYER, Circuit Judge:

In an action brought by the United States Environmental Protection Agency ("EPA") under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., to recover over $5 million in costs incurred in cleaning up a hazardous waste site in Minden, West Virginia, the district court found that the government's attorneys deliberately and in bad faith breached their duty of candor owed to the court during the course of proceedings. The court found that Robert E. Caron, the EPA's on-scene coordinator for the cleanup, had misrepresented his academic achievements and credentials in this and in other cases and that the government's attorneys wrongfully obstructed the defendants' efforts to root out the discrepancies and failed to reveal them once they learned of them.[1] Finding the breaches "most egregious and disturbing," the court dismissed the action with prejudice, concluding that dismissal was "the only sanction available that is consistent with the duty of candor violations." The court also awarded the defendants attorney's fees.

---

1. Caron later resigned from the EPA and pled guilty to the criminal charge of making material false declarations in violation of 18 U.S.C. § 1623.

On appeal, the government contends that the district court adopted an overly broad interpretation of the applicable rules of lawyer conduct and abused its discretion in imposing the most severe sanction by dismissing the action.

Having reviewed the record carefully, we affirm the district court's detailed findings of fact and its conclusion that the government attorneys violated their duty of candor. In light of the strong policy that cases be decided on their merits, however, we believe that outright dismissal is not required to punish and deter effectively the misconduct in question and to repair the wrongs done to the defendants. We therefore vacate the judgment and remand solely for the purpose of entering a sanction short of dismissal.

## I

Shaffer Equipment Company, a firm in Minden, West Virginia, was engaged in the business of rebuilding electrical substations for the local coal mining industry, which involved the storing and disposing of transformers and capacitators on its property. Shaffer Equipment also modified transformers for customers, which often involved disposing of residual transformer fluid. Evidence revealed that while some of the fluid was simply poured onto the ground, the predominant practice was to store the fluid in drums and containers at the site, some of which later deteriorated and leaked fluid onto the ground. In response to a complaint, West Virginia authorities and the EPA tested soil samples from the site and discovered that the soil at the site was contaminated with polychlorinated biphenyls ("PCB's"). Because of the risk to persons in the area, the EPA regarded the site as hazardous and in need of remediation.

The EPA approached Anna Shaffer, the sole proprietor of Shaffer Equipment, and Berwind Land Corporation, the owners of the contaminated land, requesting that they undertake a cleanup of their land. Shaffer indicated that she did not have the resources to undertake a cleanup, and Berwind Land Corporation denied responsibility. The EPA accordingly undertook to clean up the site beginning in December 1984. It designated Robert E. Caron as the "On–Scene Coordinator."

The methodology initially chosen by the EPA to remedy the site's contamination was a new technology recommended by Caron, described as a "solvent extraction method," by which contaminated soil is washed on site in methanol to extract the PCB's. The method is designed to avoid transportation of contaminated soil to a remote landfill for disposal. Although the EPA expended over $1 million in implementing its solvent extraction plan at the site, the technique failed to achieve sufficient success to justify its continued use, and Caron directed abandonment of the method about a year after it was begun. Ultimately, the EPA removed 4,735 tons of contaminated soil to a hazardous waste dump in Alabama, as well as 23 drums of capacitators, 24 drums of transformer fluid, 32 drums of transformer flush, and 31 transformers. Over 200 truckloads were required for the transportation. The site and the Shaffer Equipment office building were thereafter restored, cleanup facilities were destroyed, and excavations were backfilled and graded. The entire cleanup was completed by December 1987, and the total cost, including the expenses incurred for the failed solvent extraction method, was ultimately reported by the EPA to be over $5 million.

In December 1990, the United States commenced this action under CERCLA to recover its response costs from the defendants. Following discovery, the district court established a schedule for filing summary judgment motions and for trial. After all summary judgment motions were filed, but before trial, the court received a letter dated January 31, 1992, from the Assistant United States Attorney whose appearance had been entered for the United States in the case, which stated:

A serious problem has arisen with regard to the testimony of a material EPA witness in the above-referenced action. The United States Attorney's Office has been advised that an investigation has been commenced by the appropriate governmental authorities. As a result of the pendency of those investigations and information provided to the United States by counsel for

the defendants the United States is unable to proceed in good faith with the litigation of this action until further inquiry is made. We are, therefore, filing the attached Motion for a Stay of all proceedings in this action and respectfully request that the Court allow us a period of sixty days to evaluate this case in light of this information.

As it was later disclosed to the court, the EPA On–Scene Coordinator, Caron, had misrepresented his academic credentials and qualifications in this case and others, and this information had not been brought promptly to the attention of counsel for the defendants and the court.

The court granted the stay and directed the United States to conduct its investigation and to report by March 13, 1992, whether the United States wished to continue prosecuting the case. When the government reported that it would continue with the case, counsel for defendants filed a motion to dismiss the action for bad faith conduct.

. After receiving the relevant documents about the charges, the district court conducted a two-day hearing directed largely to receiving the testimony of the attorneys involved. Based on conduct that began in September 1991 and which continued through January 1992, the court found that the government's attorneys repeatedly and deliberately violated their duty of candor to the court by failing to disclose Caron's misrepresentations, by obstructing defendants' efforts to discover them, and by continuing the litigation and filing court papers dependent on an administrative record developed largely by Caron. The district court's findings of fact relevant to government misconduct are reported fully at United States v. Shaffer Equipment Company, 796 F.Supp. 938, 942–49 (S.D.W.Va.1992), and therefore we repeat only those necessary to our discussion.

When the defendants first scheduled the deposition of Caron for September 12, 1991, an EPA assistant regional counsel, Charles Hayden, reviewed Caron's academic credentials. Caron was unable to produce his college diploma (allegedly because his mother failed to mail it to him), but he stated that he had received an undergraduate degree from Rutgers University in 1978 and had taken courses at Drexel University, Trenton State College, and Brookdale Community College. As it was later discovered, Caron in fact did not complete his class work for a degree from Rutgers and never attended any classes at any of the other schools.

On the morning of September 12, prior to the deposition, Hayden learned that Caron had not formally received a degree from Rutgers and so advised J. Jared Snyder, a Department of Justice attorney representing the government at the deposition. At the deposition, however, Caron testified, in the presence of Snyder, that he had completed all of the requirements for a degree at Rutgers and that the only reason he had not received his diploma was a question of paperwork. Caron also testified that he had continued taking courses at Drexel for a masters degree. He stated that his bachelors degree work was in environmental science and that his masters degree work was in organic chemistry.

When the deposition was resumed about two months later, on November 27, 1991, Caron was shown a copy of a professional resume on which he had claimed to have received a B.S. degree in environmental science from Rutgers and an M.S. degree in organic chemistry from Drexel. At that point, Snyder directed the witness not to answer any questions about the resume, claiming that the inquiry was not relevant, despite defense counsel's assertion that Caron's credibility was at issue. When counsel for the defendants suggested that the parties obtain a court ruling, Snyder took a recess from the deposition and consulted with the Assistant United States Attorney who recommended that Snyder state his objections on the record but allow Caron to answer the questions. Snyder then called his superior at the Department of Justice, William A. Hutchins, who called his superior, Bruce Gelber, who called the Deputy Regional Counsel of the EPA, Michael Vaccaro. Following the various calls, Hutchins eventually called Snyder back and instructed him to advise Caron of the option to refuse giving further testimony until Caron obtained his own attorney.

In addition, Hutchins advised Snyder to permit Caron to answer if Caron so elected and to place any objections on the record. When the deposition resumed, Snyder followed Hutchins' instructions, but he continued to maintain that the questioning was irrelevant: "There is no foundation to any questions relating to his [Caron's] credibility. In fact, I don't even think his credibility is an issue in any way." Defense counsel agreed not to proceed on the issue of Caron's credentials further because, as the court found, counsel concluded that to do so would create the appearance of taking advantage of Caron by questioning him without his having first consulted an attorney.

Two days after the deposition, Snyder researched the question of whether Caron's credibility was relevant to the litigation and concluded that it was relevant as a matter of law. Snyder nonetheless did not supplement the government's response to an earlier interrogatory directed to Caron's credentials (to which the government had objected on the basis of irrelevance) and did not withdraw the relevancy objection to the discovery, despite his conclusion that the inquiry was relevant under current law.

In early December 1991, Vaccaro began an EPA civil investigation into Caron's credentials, advising Hutchins of the investigation and directing him not to advise anyone about it. Vaccaro also told Hutchins that a discrepancy had appeared in Caron's employment application with the EPA and that Caron had testified under oath in another case that he had earned a masters degree. On December 19, 1991, after Vaccaro told the EPA Office of the Inspector General about "the Caron problem," the Inspector General began a criminal investigation. Vaccaro advised Hutchins that he had contacted the Inspector General's office; Hutchins did not learn until later, in early January, that the Inspector General had commenced the criminal investigation.

Hutchins learned in December, during the course of his own investigation, that of the Superfund sites on which Caron had worked six were in litigation. Hutchins then instructed the government attorneys on each of those six cases that the government was not to rely on Caron's testimony. Hutchins also directed the attorneys not to disclose the existence of any investigation because to do so might prejudice the investigation and might also violate Caron's privacy rights.

As the attorney on this case, Snyder received Hutchins' instructions and followed them. Thus, in December 1991, when Snyder prepared the government's motion for summary judgment, he did not cite any testimony from Caron, nor did he include any affidavits executed by Caron. But Snyder did base the summary judgment motion on the administrative record compiled under Caron's direction as the On–Scene Coordinator during the cleanup. The district court found that "Caron [had] played a significant role in the preparation of documents contained in the administrative record."

On January 7, 1992, the defendants, in an effort to learn more facts about Caron's qualifications and credentials, subpoenaed records from the various colleges identified by Caron during his deposition. When Snyder learned of this, he telephoned counsel for the defendants to object because the subpoena was served after December 31, 1991, the discovery cutoff date. Snyder followed up with a letter requesting that the subpoena be withdrawn and that the documents be returned to the various institutions. Drexel University later reported that it had no record of Caron's attendance there, and Snyder was so advised by defense counsel. In response, Snyder wrote a letter of thanks dated January 17, 1992, stating that "we are looking into the matter and will let you know if Mr. Caron's testimony requires correction." While Snyder had also intended, in that letter, to disclose the existence of the criminal investigation and had so drafted the letter, Hutchins and Gelber directed him to delete the reference, and Snyder followed the instruction.

On January 17, 1992, Snyder filed the government's motion for summary judgment which he had started preparing in December. He made no mention of the EPA investigation, the criminal investigation, or the misstatements or misrepresentations of Caron's credentials.

Still attempting to discover the extent of the Caron problem after the government filed its summary judgment motion, defense counsel discovered in late January 1992, through independent means, that Caron had testified falsely in another case. Defense counsel decided to bring this evidence to the attention of the Assistant United States Attorney on the case who, following consultation with Snyder and Hutchins, then advised the court for the first time in a letter dated January 31, 1992, of the Caron problem and requested a stay.

Based on these facts, the district court concluded that Snyder and Hutchins violated their general duty of candor to the court as well as the particular duties imposed by West Virginia Rule of Professional Conduct 3.3 (describing the lawyer's duty of candor toward the tribunal) and Federal Rule of Civil Procedure 26(e)(2) (obliging counsel to supplement discovery requests). With respect to Snyder's conduct, the court found that even though Snyder knew, as of September 12, 1991, that Caron had no college degree, he obstructed efforts by defense counsel to discover this at the November 27 deposition by instructing Caron not to answer questions about his resume which claimed that Caron had two college degrees. The court also found that Snyder failed to withdraw his objections to interrogatories submitted earlier and to modify the positions taken in the deposition, or to advise the court or opposing counsel when he concluded two days later, through his own independent legal research, that Caron's credibility in this case was relevant. The court found that despite discovering the discrepancies in Caron's employment application with the EPA, the commencement of an investigation by the EPA, and the commencement of a criminal investigation, Snyder "continued to litigate the matter unabated without disclosing the investigations to the Court."

With respect to Hutchins, Snyder's superior, the district court found that his actions were "egregious" and constituted more severe violations. Hutchins had learned on November 27, 1991, that Caron had no college degree even though Caron's resume stated otherwise. In early December,

Hutchins had learned of (1) the EPA civil investigation, (2) the false testimony given by Caron in another litigation claiming that he had a masters degree, and (3) Vaccaro's referral of the matter to the EPA's Office of Inspector General. Shortly thereafter, in January, Hutchins had learned that an actual criminal investigation had been commenced. The district court found that Hutchins improperly continued the litigation without disclosing to the court the existence of the ongoing investigations, and that Hutchins had prevented Snyder from disclosing the facts when Snyder had proposed to do so in a letter to opposing counsel. Finally, the court also found that Hutchins improperly concealed his knowledge that Caron had testified falsely in other cases and in affidavits sent to the EPA Office of Inspector General.

Concluding its findings regarding the conduct of the government's attorneys, the district court stated,

[C]ounsel for the United States has deliberately placed its loyalty and allegiance to its agency client (EPA) and client's servant (Robert Caron) far and above the unending duty of candor owed to this Court. Such conduct is reprehensible and lies in bad faith.

796 F.Supp. at 951–52. Stating that the only sanction appropriate to address the violation was dismissal, the court dismissed the action under its inherent powers and awarded the defendants their attorney's fees incurred in responding to the government's misconduct, under the Equal Access to Justice Act, 28 U.S.C. § 2412.

This appeal followed.

## II

The underlying factual findings of the district court are not contested and, based on our review of the record, we conclude that they are not clearly erroneous. The government does advance additional facts that tend to provide explanations about why certain actions were taken, focusing particularly on the issue of whether Caron's credentials were material and what information government counsel were entitled to credit as the problem emerged. The heart of the govern-

ment's position, however, is its contention that the district court misunderstood and misapplied West Virginia Rule of Professional Conduct 3.3 (describing the lawyer's duty of candor toward the tribunal).[2] This is a question of law and we review it *de novo*.

The government contends that a proper application of Rule 3.3 requires "close adherence" to the specific provisions of the rule which mandate disclosure only when an attorney has *actual knowledge* of a *material fact* which, if not disclosed, will assist *a client's* criminal or fraudulent act.[3] The government argues that even if its attorneys are imputed with *actual* knowledge of Caron's discrepancies, which it denies, Caron's veracity was not material to the government's case to recover response costs under CERCLA because proof of that case does not rely on Caron's testimony but instead on the administrative record, subject to review on an arbitrary and capricious standard. *See* 42 U.S.C. § 9613(j). In addition, the government argues that Rule 3.3 is not violated because its lawyers were not assisting a *client's* fraudulent act. The government maintains that the United States could not be defrauding the court since its claim relied only on the administrative record which has not been shown to be false. Finally, the government argues that opposing counsel already had impeachment information about Caron to use in response to the motion for summary judgment, and that even if the information were inadequate, the government made full disclosure before the defendants were called upon to respond to the motion.

■ It appears that the district court, in finding that the government's attorneys violated a duty of candor to the court, applied the general duty of candor imposed on all attorneys as officers of the court, as well as the duty of candor defined by Rule 3.3. Although the court referred to Rule 3.3, it also described the duty of candor more broadly as that duty attendant to the attorney's role as

an officer of the court with a "continuing duty to inform the Court of any development which may conceivably affect the outcome of litigation." 796 F.Supp. at 950. It concluded, "Thus, attorneys are expected to bring directly before the Court all those conditions and circumstances which are relevant in a given case." *Id.* In its brief, the government did not address the existence, nature, and scope of any general duty of candor and whether its attorneys violated that duty. Nevertheless, we are confident that a general duty of candor to the court exists in connection with an attorney's role as an officer of the court.

Our adversary system for the resolution of disputes rests on the unshakable foundation that truth is the object of the system's process which is designed for the purpose of dispensing justice. However, because no one has an exclusive insight into truth, the process depends on the adversarial presentation of evidence, precedent and custom, and argument to reasoned conclusions—all directed with unwavering effort to what, in good faith, is believed to be true on matters material to the disposition. Even the slightest accommodation of deceit or a lack of candor in any material respect quickly erodes the validity of the process. As soon as the process falters in that respect, the people are then justified in abandoning support for the system in favor of one where honesty is preeminent.

■ While no one would want to disagree with these generalities about the obvious, it is important to reaffirm, on a general basis, the principle that lawyers, who serve as officers of the court, have the first line task of assuring the integrity of the process. Each lawyer undoubtedly has an important duty of confidentiality to his client and must surely advocate his client's position vigorously, but only if it is truth which the client seeks to advance. The system can provide no harbor

---

**2.** The West Virginia Supreme Court of Appeals adopted the ABA Model Code of Professional Conduct as its Rules of Professional Conduct on June 30, 1988, effective January 1, 1989.

**3.** Rule 3.3 of the Rules of Professional Conduct (W.Va.1989) provides in relevant part:

(a) A lawyer shall not knowingly:

(2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client.

for clever devices to divert the search, mislead opposing counsel or the court, or cover up that which is necessary for justice in the end. It is without note, therefore, that we recognize that the lawyer's duties to maintain the confidences of a client and advocate vigorously are trumped ultimately by a duty to guard against the corruption that justice will be dispensed on an act of deceit. *See* 1 Geoffrey C. Hazard, Jr. and W. William Hodes, *The Law of Lawyering* 575–76 (1990) ("[W]here there is danger that the tribunal will be misled, a litigating lawyer must forsake his client's immediate and narrow interests in favor of the interests of the administration of justice itself.").

While Rule 3.3 articulates the duty of candor to the tribunal as a necessary protection of the decision-making process, *see Hazard* at 575, and Rule 3.4 articulates an analogous duty to opposing lawyers, neither of these rules nor the entire Code of Professional Responsibility displaces the broader general duty of candor and good faith required to protect the integrity of the entire judicial process. The Supreme Court addressed this issue most recently in *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). There, an attorney had taken steps to place certain property at issue beyond the jurisdiction of the district court and had filed numerous motions in bad faith, simply to delay the judicial process. The district court, the court of appeals, and the Supreme Court all agreed that neither Federal Rule of Civil Procedure 11 (subjecting to sanction anyone who signs a pleading in violation of the standards imposed by the rule) nor 28 U.S.C. § 1927 (subjecting to sanction anyone who "multiplies the proceedings ... unreasonably and vexatiously") could reach the conduct. However, the Supreme Court accepted the district court's reliance on the inherent power to impose sanctions, rejecting arguments that Rule 11 and § 1927 reflect a legislative intent to displace a court's power to vacate a judgment upon proof that a fraud has been perpetrated upon the court:

> We discern no basis for holding that the sanctioning scheme of the statute [28 U.S.C. § 1927] and the rules displaces the inherent power to impose sanctions for the bad faith conduct described above. These

other mechanisms, taken alone or together, are not substitutes for the inherent power, for that power is both broader and narrower than other means of imposing sanctions. First, whereas each of the other mechanisms reaches only certain individuals or conduct, the inherent power extends *to a full range of litigation abuses.* At the very least, the inherent power must continue to exist to fill in the interstices.

501 U.S. at ——, 111 S.Ct. at 2134 (emphasis added).

The general duty of candor and truth thus takes its shape from the larger object of preserving the integrity of the judicial system. For example, in *Tiverton Board of License Commissioners v. Pastore*, 469 U.S. 238, 105 S.Ct. 685, 83 L.Ed.2d 618 (1985), counsel failed to apprise the Supreme Court that during the appeal process, one of the respondents, a liquor store challenging the admission of evidence at a Rhode Island liquor license revocation proceeding, had gone out of business, rendering the case moot. Rebuking counsel for failing to comply with a duty of candor broader than Rule 3.3, the Supreme Court stated, "It is appropriate to remind counsel that they have a *'continuing duty to inform the Court* of any development *which may conceivably affect the outcome'* of the litigation." *Id.* at 240, 105 S.Ct. at 686 (quoting *Fusari v. Steinberg*, 419 U.S. 379, 391, 95 S.Ct. 533, 540, 42 L.Ed.2d 521 (1975) (Burger, C.J. concurring)) (emphasis added).

The general duty to preserve the integrity of the judicial process was similarly identified in *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944). Without the support of any rule, the Court opened up a long-standing judgment because one of the litigants had introduced a document at trial which was later discovered to be fraudulent. The Supreme Court stated,

> It is a *wrong against the institutions* set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that *preservation of the integrity of the judicial process* must always wait upon the

diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.

*Id.* at 246, 64 S.Ct. at 1001 (emphasis added).

■ In this case, the district court found that both Snyder and Hutchins repeatedly failed to advise the court of the Caron problem and the civil and criminal investigations relating to it, continuing "to litigate the matter unabated." Without repeating the factual findings which support the court's conclusion, we are satisfied that these are matters involving deceit that, when not disclosed, undermine the integrity of the process. Moreover, their disclosure could conceivably have affected the outcome of the litigation, as we discuss more fully, below. Accordingly, the conduct violates the general duty of candor that attorneys owe as officers of the court. *See Pastore,* 469 U.S. at 240, 105 S.Ct. at 686.

Even limiting our consideration to the provisions of Rule 3.3 which, the government argues, define a lawyer's duty of candor more restrictively, we are nevertheless satisfied that the district court was justified in finding that the government's attorneys breached their duty of candor under that rule.

Rule 3.3 of Professional Conduct, which defines the duty of candor to the tribunal, states in pertinent part, "A lawyer shall not knowingly ... fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client." The government argues that the defendants failed in this case to establish three critical elements of the rule: (1) that the government's attorneys had actual knowledge of Caron's misrepresentations, (2) that Caron's credentials were material, and (3) that the attorney's conduct in failing to disclose the Caron problem assisted the EPA in a fraudulent act. We will address these contentions in order.

■ Addressing first the "actual knowledge" requirement of Rule 3.3, the government contends that, while it may have had suspicions about Caron's misstatements, it did not fully appreciate their falsity until the

investigation was completed. While it is true that a mere suspicion of perjury by a client does not carry with it the obligation to reveal that suspicion to the court under Rule 3.3, *see In re Grievance Comm. of the United States Dist. Court,* 847 F.2d 57, 63 (2d Cir. 1988), the government's attorneys in this case cannot find shelter behind any such doubt. Caron admitted to Snyder as early as September 1991 that he did not have a college degree. By December 1991, when an EPA investigation was under way and EPA regional counsel had referred the matter to the Office of Inspector General, the lawyers for the United States had actual knowledge of the discrepancy in Caron's sworn testimony in which he said, on the one hand, that he had no college degree and, on the other, that he had both a bachelor of science degree and a masters degree. At that time, the government's lawyers also had had conversations with Rutgers University which confirmed that no degree had been issued, were aware of misrepresentations on Caron's employment application, and actually possessed a copy of Caron's fraudulent resume. Against this evidence, the government's claim to have held only a suspicion rings hollow.

We move to the government's principal argument under Rule 3.3, that the information which Caron falsified in his credentials was not material to the proceeding. First of all, we find the sincerity of the position undermined because Snyder, the Justice Department attorney in this case, reached the exact opposite conclusion during the course of his independent research in November 1991. Moreover, when the Assistant United States Attorney for the Southern District of West Virginia was presented with an example of Caron's perjury by counsel for the defendants, he promptly wrote a letter to the court asking for a stay in which he stated, "A serious problem has arisen with regard to the testimony *of a material EPA witness*" (emphasis added). But it is principally an analysis of the record which leads us to the conclusion that the information is material.

The issue before the district court in this case was whether the defendants are liable to the EPA for costs incurred in cleaning up a hazardous waste site. To establish its case,

the government must demonstrate that the release or the threatened release of hazardous wastes caused the EPA to incur "response costs." 42 U.S.C. § 9607(a). One method for challenging the appropriateness of the response costs is for the defendant to demonstrate that the methods of cleaning up are not consistent with the National Contingency Plan established by CERCLA, 42 U.S.C. § 9601 *et seq.* Procedurally, the government relies on the administrative record developed during the cleanup, and the defendant bears the burden of demonstrating that this reliance is arbitrary and capricious. *See* 42 U.S.C. § 9613(j). Because this method for establishing its case relies on the administrative record and not testimony, the government argues that Caron's credibility and credentials are not material. This position, however, ignores the fact that the *integrity* of the administrative record *is* relevant to inquiries about both the propriety of costs and the EPA's response selection. It is undisputed that Caron was responsible for making that record.

The administrative record in this case is large, consisting of volumes of bills, communications, and authorizations developed primarily from on-site activity. The person placed in overall charge of the site was Robert Caron. While Caron's decisions were subject to approval by superiors, as On–Scene Coordinator he made most of the decisions and, when he sought the approval of superiors, his recommendations were adopted in virtually all of the cases. It was Caron who recommended and obtained approval for the solvent extraction method, side-stepping the traditional method of physically removing the contaminated soil. As it turned out, the pilot process proved unsatisfactory and the traditional method of removing the soil was ultimately utilized. However, the experimental process was abandoned only after over $1 million in costs were incurred, which the EPA now seeks to impose on the defendants. While Caron's role in this litigation relates primarily to supporting response selection, he also had a major role in approving project-related expenditures. Thus, Caron's credentials, capability and credibility are relevant to the examination of the administrative record in this case.

Even where review of a case is confined to the evidence contained in the administrative record, the Supreme Court has concluded that evidence of bad faith or improper behavior by an administrative agency's official in compiling that record justifies inquiry beyond the record compiled. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825–26, 28 L.Ed.2d 136 (1971). The fact that the government's agent in charge of monitoring expenses and selecting responses filed fraudulent documents with the federal government and perjured himself repeatedly in connection with his federal employment is, we think, of primary relevance to an examination of the integrity and reliability of the administrative record.

It is obviously difficult to assess the impact that Caron's fraud may have had on the development of the record, particularly on the selection of the solvent extraction method, an issue hotly debated by the parties. Would Caron have been given the responsibility for initiating a pilot program if his credentials had not been misrepresented to the EPA in his employment application? Would his recommendations have carried the same weight on review by superiors? To what extent are the defendants saddled in this case with decisions in the administrative record tainted by questions of competence and integrity? While it may never be possible to find answers to these questions and therefore accurately assess the full impact of the fraud, that inability must not, by default, cause the administrative record to be accepted as is and the fraud to be deemed immaterial. *See Hazel–Atlas Co.,* 322 U.S. at 247, 64 S.Ct. at 1001–02. Given the great possibility that Caron's deception affected administrative decisions in this case and disguised a weakness in his capabilities, we cannot agree with the government that the sole relevance of the "Caron problem" is with regard to impeachment of Caron's testimony. That approach is too narrow. *See Citizens to Preserve Overton Park,* 401 U.S. at 420, 91 S.Ct. at 825–26. Moreover, the significance of impeaching the principal EPA witness, who was largely responsible for developing the record, renders impeachment information material. We thus reject the government's

position that the court is essentially stuck with an unimpeachable administrative record. We conclude that the district court did not err in finding this issue to be material.[4]

Once we find the government's attorneys had actual knowledge of Caron's deception and that the deception was material under Rule 3.3, we move to a review of whether Caron's conduct amounted to a fraudulent act of the EPA. The government's attorneys argue that no fraud was attempted *by their client*, the EPA, and that in the absence of such an attempt, they had no responsibility to reveal Caron's perjury under the duty of candor under Rule 3.3. Again, we disagree. Caron's perjury in an attempt to cover up his earlier deception was certainly a fraudulent act. Since Caron was involved in the case as an important agent of the EPA and his misrepresentation was made in the course of his employment with the EPA with the effect of disguising a weakness in the EPA's case, his action is fairly characterized as an act of the EPA.

Distilling the district court's findings, this case reduces to an effort by an important EPA witness to cover up or minimize his long history of fraud. The government's attorneys compounded the problem by obstructing the defendants' efforts to uncover this perjury and in failing themselves to reveal it. When the government's attorneys filed a motion for summary judgment dependent on the administrative record made by Caron and requested a favorable resolution of the case prior to a full documentation of the perjury, these attorneys overstepped the bounds of zealous advocacy, exposing themselves and their employer to sanctions. While this violation was effectively brought to light by opposing counsel, this was not done until after the expenditure of significant time and money.[5]

## III

The district court, exercising its inherent power, imposed the most severe sanction and dismissed the government's CERCLA action against the defendants, concluding that dismissal with prejudice is "the only sanction available that is commensurate with the duty of candor violations by counsel" and that dismissal not only penalizes the improper conduct but also deters others. The court added, "Today we will send a message to all counsel who appear before this Court that the duty of candor will be upheld and preserved at all times irrespective of the identity of the parties and the monetary stakes in the litigation." 796 F.Supp. at 953.

The government contends that, in dismissing its case outright, the district court "erroneously weighed the public and private interests." In particular, the government argues that the district court failed to give adequate consideration to lesser sanctions that could deter and rectify the unethical conduct while at the same time vindicate the public interest in having the defendants pay for cleaning up their hazardous waste. Before addressing specifically the government's argument, it is helpful to review the scope of the court's inherent powers.

Due to the very nature of the court as an institution, it must and does have an inherent power to impose order, respect, decorum, silence, and compliance with lawful mandates. This power is organic, without need of a statute or rule for its definition, and it is necessary to the exercise of all other powers. *See Chambers*, 501 U.S. at ——, 111 S.Ct. at 2132. Because the inherent power is not regulated by Congress or the people and is particularly subject to abuse, it must be exercised with the greatest restraint and caution, and then only to the extent necessary. *See id.; Roadway Express, Inc.*

---

4. The district court found:

   > Caron's misrepresentations of his academic credentials and the resulting civil and criminal investigations are *relevant and material to this litigation* in light of Caron's active role as EPA's OnScene Coordinator and his contributions to the administrative record.
   > 796 F.Supp. at 950 (emphasis added).

5. Indeed, the defendants contend that the United States brought the "Caron problem" to the district court *after*, not before, any fraud was perpetrated and then only by the Assistant United States Attorney after she was advised of Caron's perjury. They state that the attorneys who committed the misconduct had no plans at the time to seek a stay of the proceedings. Brief of Appellees at p. 30.

v. *Piper*, 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980) (restraint required because the inherent powers of a court are "shielded from direct democratic controls"). Under the inherent power, a court may issue orders, punish for contempt, vacate judgments obtained by fraud, conduct investigations as necessary to exercise the power, bar persons from the courtroom, assess attorney's fees, and dismiss actions. Since orders dismissing actions are the most severe, such orders must be entered with the greatest caution.

■ The Supreme Court has held that a judgment obtained by fraud may be vacated under a court's inherent power, *see Hazel–Atlas Co.*, 322 U.S. at 248, 64 S.Ct. at 1002; that an action not prosecuted may be dismissed, *see Link v. Wabash Railroad Co.*, 370 U.S. 626, 629–30, 82 S.Ct. 1386, 1388, 8 L.Ed.2d 734 (1962); and that bad faith or abuse can form a basis for a realignment of attorney's fees, *see Chambers*, 501 U.S. at ——, 111 S.Ct. at 2133. While we have not published on the subject, the inherent power to dismiss a case for the misconduct of counsel is undoubtedly clear.[6] In *Hazel–Atlas Co.*, the Supreme Court observed that the court of appeals could have dismissed that case where it was discovered that counsel had suppressed the truth about the authorship of an important article offered into evidence. 322 U.S. at 250, 64 S.Ct. at 1003. The power has been recognized also by courts of appeals. *See Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir.1989) (recognizing the inherent power to dismiss where a party "defiles the judicial system in committing a fraud on the court"); *Halaco Engineering Co. v. Costle*, 843 F.2d 376, 380 (9th Cir.1988) (recognizing the inherent power to dismiss EPA case for discovery abuses, but reversing dismissal order as excessive in the circumstances); *United States v. National Medical Enterprises, Inc.*, 792 F.2d 906, 912 (9th Cir.1986) (recognizing the inherent power to dismiss for government's improper influencing of trial witnesses, but reversing dismissal order for district court to reconsider pursuant to the "appropriate legal stan-

dard"). In *National Medical Enterprises*, the court confirmed its standard that dismissals under the inherent power are justified if "a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." 792 F.2d at 912 (quoting *Fjelstad v. American Honda Motor Co.*, 762 F.2d 1334, 1338 (9th Cir.1985)).

■ Accordingly, we recognize here that when a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process, the court has the inherent power to dismiss the action. Our review of the use of that power on appeal is for an abuse of discretion.

■ Mindful of the strong policy that cases be decided on the merits, and that dismissal without deciding the merits is the most extreme sanction, a court must not only exercise its inherent power to dismiss with restraint, but it may do so only after considering several factors, which we have detailed under other circumstances. *See Hillig v. Commissioner*, 916 F.2d 171, 173–74 (4th Cir.1990) (dismissal under Fed.R.Civ.P. 41(b)); *Wilson v. Volkswagen of America, Inc.*, 561 F.2d 494, 504 (4th Cir.1977) (dismissal under Fed.R.Civ.P. 37(b)), *cert. denied*, 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 768 (1978); *Davis v. Williams*, 588 F.2d 69, 70 (4th Cir.1978) (dismissal under Fed. R.Civ.P. 41(b)). Thus, before exercising the inherent power to dismiss a case, a court must consider the following factors: (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney, recognizing that we seldom dismiss claims against blameless clients; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and

---

**6.** In an unpublished opinion, *Liva v. County of Lexington*, No. 91–2337, 1992 WL 187299 (4th Cir. Aug. 6, 1992), we affirmed the dismissal under the court's inherent power where the plaintiff presented false evidence to support a personal injury claim.

deterring similar conduct in the future; and (6) the public interest.

In this case, the government proposed to the district court a lesser sanction to be imposed if a breach of the duty of candor were to be found. It suggested (1) opening for *de novo* review the administrative record with respect to the selection of the solvent extraction method; (2) allowing discovery by defendants on the EPA's selection of the solvent extraction method; and (3) allowing discovery on any and all matters involving Caron. The district court rejected this offer as a "rather slight sanction." Because it found the conduct in this case to be "most egregious and disturbing," the court concluded that dismissal with prejudice was "the only sanction available that is commensurate with the duty of candor violations." 796 F.Supp. at 953. The court also observed that the duty of candor is "priceless" and must be enforced "without reservation." *Id.*

In doing so, we believe that the district court did not adequately address the broad policies of deciding the case on the merits where the orderly administration of justice and the integrity of the process have not been permanently frustrated, and of exercising the necessary restraint when dismissal is based on the inherent power. Thus, we reverse its dismissal order. We are confident that the district court's objective of punishing the wrongdoers, deterring similar future conduct, and compensating the defendant can be achieved by a sanction, short of dismissal, tailored more directly to those goals. *See Halaco Engineering Co.*, 843 F.2d at 380–82.

The occasion to consider the disciplining of members of the bar is not a happy one, and the district court's response was understandably stern. We are in full agreement with the district court's expressed concern, and we repeat that our adversary system depends on a most jealous safeguarding of truth and candor. But we also observe that through an outright dismissal, the defendants receive the benefit of a total release from their obligations under the environmental protection laws. This would provide the defendants relief far beyond the harm caused by the government attorneys' improper conduct and would frustrate the resolution on the merits of a case which itself has strong policy implications. Unfortunately, these factors were not adequately considered.

Without suggesting a sanction which is appropriate, we point out that in considering the proper role of the administrative record in this case and the respective burdens of proof, the district court may deny the government the benefit of any portion of the record or the right to claim any expense, which may have been tainted by Caron's misconduct, even if it becomes impossible to assess accurately the extent of that taint. Because of the government's misconduct, the benefit of any doubt must be resolved in the defendants' favor. In *Hazel–Atlas Co.*, for example, where the effect on a judgment of the admission of a fraudulent document could not be accurately assessed, the Court resolved the question against the wrongdoer and vacated the entire judgment. It stated:

> Doubtless it is wholly impossible accurately to appraise the influence that the article exerted on the judges. But we do not think the circumstances call for such an attempted appraisal. Hartford's officials and lawyers ... are in no position now to dispute its effectiveness.

322 U.S. at 247, 64 S.Ct. at 1001–02.

Accordingly, we affirm the district court's finding that a breach of ethical conduct occurred, but we vacate the judgment of the district court dismissing the case and remand for the imposition of a sanction short of outright dismissal. Since an award of attorney's fees may be part of the district court's overall calculus in selecting a sanction after further proceedings, we leave for later review, if necessary, any question on whether attorney's fees were appropriately awarded.

*AFFIRMED IN PART, REVERSED IN PART, VACATED AND REMANDED.*