**In re Michael E. HENTGES,**
**Alleged Debtor.**

**No. 05–30076 R.**

United States Bankruptcy Court,
N.D. Oklahoma.

June 1, 2006.

Stephen J. Capron, Capron & Edwards, P.C., Tulsa, OK, for Alleged Debtor.

Robert S. Glass, R. Charles Wilkin, III, Brian L. Mitchell, Glass Law Firm, P.C., Tulsa, OK, for Petitioning Creditor Virginia D. Marks.

James R. Hicks, Morrel, West, Saffa, Craige & Hicks, Inc., Tulsa, OK, for Petitioning Creditor Paul R. Hodgson.

Michael James King, Winters, King & Associates, Inc., Tulsa, OK, for Petitioning Creditor, Tulsa National Bank N.A.

### ORDER DENYING MOTION TO MODIFY APRIL 18, 2006 ORDER

DANA L. RASURE, Bankruptcy Judge.

Before the Court is the Motion to Modify April 18, 2006 Order (Doc. 68) (the "Motion to Modify") filed on May 2, 2006, by and on behalf of the involuntary debtor's attorney Stephen J. Capron; the Peti-

tioning Creditors' Response to Capron's Motion to Modify April 18, 2006 Order (Doc. 85) ("Response to Motion to Modify") filed by the Petitioning Creditors Virginia Marks, Paul R. Hodgson and Tulsa National Bank (the "Petitioning Creditors") on May 22, 2006; and the Reply to Motion to Modify April 18, 2006 Order (Doc. 87) ("Reply to Motion to Modify") filed on May 25, 2006.

Mr. Capron requests that the Court modify the Order Denying Application of Counsel of Involuntary Debtor for Compensation and Reimbursement of Attorneys' Fees (Doc. 65) (the "Order") that was entered on April 18, 2006, to strike footnote 21 of the Order ("Footnote 21") because, he contends, the Court's comments "represent a character attack on Capron who, at all times, acted appropriately and honestly before this Court, and whose conduct does not deserve the harsh condemnation of this Court or the resulting damage expected from this Court's comments or from the expected re-publication of this Court's comments." Motion to Modify at ¶ 4.[1]

Upon consideration of the Motion to Modify, the Response to Motion to Modify, the Reply to Motion to Modify, the Order, the transcripts of hearings held in this case and documentary evidence presented therein, and the applicable law, the Court concludes that the Motion to Modify should be denied.

■ Footnote 21, in which the Court documented examples in support of its observation that "allegations and arguments made by [the Involuntary Debtor] Hentges and Counsel in these proceedings too often turned out to be without factual or legal bases," Order at 36, is well supported by the record and constitutes an appropriate comment on Mr. Capron's advocacy in his pleadings and during the hearings held on January 26, 2006 and March 30, 2006. During the hearing of March 30, 2006, the Court admonished Mr. Capron to be "very careful" about representations made to the Court. The Court intended the footnote as a further warning to Mr. Capron that his brand of advocacy bordered upon or exceeded the outermost boundaries of acceptable professional conduct. As an officer of the Court, Mr. Capron had a duty to insure that factual representations made to the Court were truthful and had evidentiary support and that his legal arguments were "not frivolous" and that they constituted "a good faith argument for an extension, modification or reversal of existing law." Rule 3.1 of the Oklahoma Rules of Professional Conduct ("ORPC"); *see also* Bankruptcy Rule 9011(b)(2). Although Mr. Capron had a duty to diligently represent his client, the requisite intensity is tempered by the duty to be honest and candid with the Court. *See* ORPC Rule 3.3; *United States v. Shaffer Equipment Co.*, 11 F.3d 450, 457–61 (4th Cir.1993) (addressing purpose and importance of the duty of candor to the tribunal in preserving the integrity and credibility of the adversarial process).

■ Nevertheless, Mr. Capron contends that Footnote 21 should be deleted as "gratuitous" because his litigation tac-

---

1. A court may treat a motion to modify as a motion to alter or amend a judgment under Bankruptcy Rule 9023 and Fed.R.Civ.P. 59(e) if the motion is filed no later than ten days after the entry of the judgment or order, or as a motion for relief from judgment or order under Rule 9024 and Fed.R.Civ.P. 60 *if the motion is filed more than ten days after the* entry of the judgment and order. The Motion to Modify was filed more than ten days after the Order and therefore will be treated as a Rule 60(b)(6) motion (*i.e.*, as one seeking relief from the Order for "any other reason justifying relief from the operation of the judgment").

tics were not relevant in determining the matter addressed by the Court in the Order, that is, whether he or his client were entitled to recover attorney fees from the Petitioning Creditors under Section 303(i) of the Bankruptcy Code. The Court need not ignore or refrain from commenting on errant attorney behavior occurring before it merely because the conduct is not relevant in ruling on the merits of the proceeding, however. The Tenth Circuit Court of Appeals recognizes that a trial court "has ample discretion to 'comment, sternly when necessary, on a lawyer's performance' in order to 'assure the proper conduct of proceedings in his or her court.'" *Butler v. Biocore Medical Technologies, Inc.*, 348 F.3d 1163, 1169 (10th Cir.2003), *quoting Williams v. United States (In re Williams)*, 156 F.3d 86, 92 (1st Cir.1998). "Due to the very nature of the court as an institution, it must and does have an inherent power to impose order, respect, decorum, silence, and compliance with lawful mandates. This power is organic, without need of a statute or rule for its definition, and it is necessary to all other powers." *Shaffer Equipment Co.*, 11 F.3d at 461, *citing Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (affirming the inherent power of courts to control and, if necessary, sanction litigation behavior in order to "achieve the orderly and expeditious disposition of cases" (quotations and citation omitted)); *accord Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 841 (10th Cir.2005). Because under *Chambers* a court has the inherent power to *sanction* conduct prejudicial to the integrity of the judicial process *sua sponte*, clearly a court is not precluded from simply footnoting in an opinion the sharp practices it has observed during the proceedings.

Mr. Capron also contends that the Court's "four point criticism" of his trial conduct lacks a factual or legal basis. The Court will therefore address the legal and factual underpinnings to the four examples of the conduct cited in Footnote 21.

**A. "Capron's argument that Hentges's liability on the Guaranty was exonerated by the Bank's extension of the notes had no legal basis."** [2]

█ As part of his argument that debt owed by Mr. Hentges to Petitioning Creditor Tulsa National Bank (the "Bank") was disputed, Mr. Capron stated:

> Mr. Hentges has separate arguments based upon whether or not the personal guaranty that is alleged by the bank is valid. And, in particular, he challenges the fact that the note was changed at some point in time. Originally I think the note was only a one-year note. There was a subsequent change and he never signed a subsequent guaranty.
>
> Now the statute relevant in Oklahoma law is Title 15, Section 338, which *essentially says that the change of the underlying note without getting a subsequent change in the guaranty or confirmation of the guaranty renders the guaranty a nullity.* That is the basis of his claim.

Transcript of Trial held January 26, 2006 ("Trial Transcript") at 30 (emphasis added), *citing* 15 O.S. § 338 ("Section 338").

Thereafter, Petitioning Creditor Marks introduced the Guaranty executed by Mr. Hentges into evidence and elicited testimony from the Bank's representative concerning the circumstances surrounding the execution of the Guaranty, the terms of the Guaranty, and the principal's default on the guaranteed indebtedness. Trial Transcript at 59–63, 67. The Commercial

**2.** Order at 36, n. 21.

Guaranty, which Mr. Hentges executed at the same time the Bank extended credit in the amount of $50,000 to Michael E. Hentges, Inc. pursuant to a promissory note, was absolute, continuing and unlimited in amount, and expressly provided in relevant part:

Amount of Guaranty. The amount of this Guaranty is Unlimited.

Continuing Unlimited Guaranty. For good and valuable consideration, Michael E. Hentges ("Guarantor") absolutely and unconditionally guarantees and promises to pay to Tulsa National Bank ("Lender") ... the Indebtedness (as that term is defined below) of Michael E. Hentges, Inc. ("Borrower") to Lender on the terms and conditions set forth in this Guaranty. Under this Guaranty, the liability of the Guarantor is unlimited and the obligations of Guarantor are *continuing*.

Indebtedness Guaranteed. The indebtedness guaranteed by this Guaranty includes *any and all of Borrower's indebtedness to Lender* and is used in the most comprehensive sense and means and includes *any and all of Borrower's liabilities, obligations and debts to Lender, now existing or hereinafter incurred or created*, including, without limitation, all loans, advances, interest, costs, debts, overdraft indebtedness, credit card indebtedness, lease obligations, and liabilities of Borrower, or any of them, and any present or future judgments against Borrower, or any of them, and whether any such Indebtedness is voluntarily or involuntarily incurred, due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined; ...

Duration of Guaranty. This Guaranty will take effect when received by Lender ... and will continue in full force *until all Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied* and all of Guarantor's other obligations under this Guaranty have been performed in full.... *This Guaranty will continue to bind Guarantor for all Indebtedness incurred by Borrower or committed by Lender prior to receipt of Guarantor's written notice of revocation, including any extensions, renewals, substitutions or modifications of the Indebtedness.* All renewals, extensions, substitutions, and modifications of the Indebtedness granted after Guarantor's revocation, are contemplated by this Guaranty, and, specifically will not be considered to be new Indebtedness.... It is anticipated that fluctuations may occur in the aggregate amount of Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of Indebtedness, even to zero dollars ($0.00), prior to the Guarantor's written revocation of this Guaranty shall not constitute a termination of this Guaranty....

Guarantor's Authorization to Lender. Guarantor authorizes Lender, either before or after any revocation hereof, *without notice or demand and without lessening Guarantor's liability under this Guaranty*, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower ...; (B) *to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term;*

Guarantor's Waivers.... Guarantor ... waives any and all rights or defenses

arising by reason of ... (F) *any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. ...*

Guarantor's Understanding with Respect to Waivers. Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the [extent] permitted by law or public policy.

Amendments. This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty....

Governing Law. This Guaranty will be governed by, construed and enforced in accordance with federal law and the laws of the State of Oklahoma....

Definitions....

Indebtedness. The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty....

Note. The word "Note" means the promissory note dated August 14, 2002, in the original principal amount of $50,000.00 from Borrower to Lender, together with *all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement.*

Commercial Guaranty ("Guaranty"), Petitioning Creditors' Exhibit 3. During Mr. Capron's cross-examination of the Bank's representative, the Court inquired about Mr. Capron's theory under which he contended the Guaranty was invalid. His response:

Mr. Capron: ... The original note signed in 2002 was for a six month period, and that's what the personal guaranty—

The Court: And that's when the continuing guaranty was executed, correct?

Mr. Capron: That's when—it's a continuing guaranty, true, but it doesn't continue past changes in the note by law.

The Court: Well, what law are you talking about?

Mr. Capron: I'm talking about the statute I cited earlier, Title 15 of the Oklahoma Statute[s], Section [338].

The Court: Which provides what?

Mr. Capron: "A guarantor is exonerated except insofar as he may be indemnified by the principal if by any act of the creditor *without the consent of the guarantor,* the original obligation of the principal is altered in any respect or the remedies or rights of the creditors against the principal in respect thereto [is] in any way impaired or ... suspended ..." So, in other words, the change in the terms of the note—this note expired, ...

The Court: Well, it matured....

Mr. Capron: It matured, that's correct. By its own terms. There was no further continuation of the note.

\*    \*    \*    \*    \*    \*

Mr. Capron: My theory is that the not[e] existed for six months. That by law the guaranty applied to that unless there was a change by the creditor in the terms of the note. There have been a number of changes. If there are changes, they can continue a guaranty, but they have to get it in writing, and they never did. And there never was a

subsequent guaranty of any subsequent notes that were executed by the bank.

\*     \*     \*     \*     \*     \*

Because the statute says that if the terms of the note are changed, which is what they're alleging, there were subsequent changes to the terms of the note, it requires a subsequent, written guaranty by Mr. Hentges.

\*     \*     \*     \*     \*     \*

The Court: [I]t appears that in the guarantor's waivers that the guarantor has waived any defenses of the borrower. So I'm not sure that—where we end up with those waivers.

Mr. Capron: Because I believe that's an unenforceable provision, Your Honor. That's the basis of his challenge to his personal guaranty for anything outside of that original six-month note.

The Court: Okay. Again I don't know why the waiver would not be enforceable, but you can help me [with] the law, I guess at the [conclusion] of the trial.

\*     \*     \*     \*     \*     \*

Mr. Capron: Well, we've got a form contract here that clearly makes provisions to exclude those provisions that are inconsistent with Oklahoma law.

The Court: But can't ... Section 338 be waived or contracted around? It's not inviolate, is it, Section 338?

Mr. Capron: *No, I don't believe it can be waived.*

The Court: And your basis for that is what?

Mr. Capron: Well, that's the basis of the challenge ...

\*     \*     \*     \*     \*     \*

The Court: You do have authority?

Mr. Capron: I do not have authority to cite to you right now. I did not understand that that would be the purpose of our hearing today.

The Court: No. I'm just looking at this from an objective basis, and ... under this guaranty there's been a waiver ... of all defenses. And unless that's invalid or Section 338 cannot be contracted around, I don't know why that wouldn't be enforceable.

Trail Transcript at 85–92 (emphasis added).

Another significant period of the trial consisted of Mr. Capron's continued cross-examination of the Bank representative to establish that the payment term of the note was extended several times.[3] Additional trial time was expended in attempting to determine Mr. Capron's legal basis for arguing that the provision in which Mr. Hentges authorized the Bank to, "without notice or demand and without lessening Guarantor's liability under this Guaranty, ... alter, compromise, renew, extend, accelerate or otherwise change one or more times the time for payment or other terms of the Indebtedness" did not constitute a consent under Section 338 and that Mr. Henges's express waiver of "any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness" was not a waiver of the defenses provided by Section 338. The Court inquired—

[B]efore we leave this issue, just so I'm trying to understand Mr. Capron's argument, ... don't the precise terms of the guaranty constitute a consent by the guarantor that allow the lender to alter, compromise, renew, extend, accelerate,

---

**3.** Mr. Capron's focus on the payment terms of the original note is a red herring because the Guaranty unambiguously encompassed *all in-* *debtedness* of Michael E. Hentges, Inc., not just the original note.

or otherwise change any one or more of the terms of payment?

\* \* \* \* \* \*

.... this guaranty is a guaranty of all indebtedness, not just a particular note, and even provides if the debt goes to zero prior to the guarantor's written revocation, that it doesn't terminate the guaranty.

\* \* \* \* \* \*

.... So if he didn't revoke it and he's consented to changing the terms, why do we have a problem under Section 338?

Mr. Capron: Because *I don't think he has consent[ed] to changing the terms.*

The Court: You don't think that the guaranty language that allows the lender to alter, compromise, renew, extend, accelerate or otherwise change the terms means what it says?

Mr. Capron: *No. I think the guaranty terminated* with the maturation of the original note six months after it was signed.

The Court: Even though the guaranty says the debt can go to zero or the loan can mature ... ?

Mr. Capron: Yes.

The Court: And what's your authority for that?

Mr. Capron: I'm relying on the statute that I previously cited, which [says] if there are changes, the statute requires a written guaranty to accompany those changes.

The Court: All right. If you're arguing legally that a guarantor can't waive those defenses or can't contract around those, I need legal authority other than just your theory, because ... I don't want anyone to submit that ... there is a theory out there for which they have no support.

Trial Transcript at 102–04 (emphasis added).

In his closing argument, Mr. Capron persisted with his argument that "the personal guaranty I don't think in and of itself is legitimate. I'd hope to have at least a couple days to [submit some] kind of an authority to you on that." Trial Transcript at 158. Mr. Capron has never submitted any authority to support his contention that the authorizations and waivers contained in the Guaranty were invalid or that they did not constitute "consent of the guarantor" required by Section 338 to the alteration or extension of the original note guaranteed by Mr. Hentges.

The Oklahoma Supreme Court has held, at least since 1937, that a guarantor's agreement, contained in the guaranty itself, that the guaranteed indebtedness may be increased, altered, extended or otherwise changed constitutes the "consent of the guarantor" to such alterations envisioned by Section 338, and thereby waives the exoneration defense to the guaranty otherwise provided by Section 338. *See Ford Motor Credit Co. v. Milburn,* 615 F.2d 892, 898–99 (10th Cir.1980) (guaranty which contained promises to pay all existing and future debts "unambiguously provide[d] the necessary consent required by section 338 in the context of a continuing guaranty"), *citing Hazzard v. General Tire & Rubber Co.,* 1937 OK 580, 76 P.2d 257 (1937); *Black v. O'Haver,* 567 F.2d 361, 369–70 (10th Cir.1977) (court rejected Section 338 exoneration defense in part because guaranty provided that the guarantor's liability is "unaffected by 'any amendment or modification of the provisions of'" the borrower's loan agreement); *First Nat'l Bank and Trust Co. v. Kissee,* 1993 OK 96, 859 P.2d 502, 508 (1993) ("A guarantor is not discharged if he consents to an extension of time for payment, or when he has expressly agreed that the

time for payment may be extended without notice. An extension of time for payment of the debtor's obligation is expressly authorized in the guaranty agreement in the case at bar."); *Hazzard,* 76 P.2d at 258–59 (guaranty that covered future advanced under a note as well as under an open account evidenced guarantor's intent and consent to guaranty additional indebtedness and was enforceable regardless of whether a new guaranty of the additional indebtedness was executed); *Haines Pipeline Const., Inc. v. Exline Gas Systems, Inc.,* 1996 OK Civ App 75, 921 P.2d 955, 961 (1996) (where guaranty provided that liability would not be impaired by lender's failure to seek a deficiency judgment against the borrower, guarantor waived defense of exoneration under Section 338).

Therefore, in light of Mr. Hentges's execution of a guaranty that was expressly unlimited and continuing, that guaranteed *all indebtedness* of the Borrower until the Guaranty was revoked, and that acknowledged that the indebtedness included, but was not limited to, the original note and all of its renewals, extensions, modifications, refinancings, and consolidations, Mr. Capron's argument that Mr. Hentges "has not consented to changing the terms" of the original note was factually baseless and legally frivolous.

■ Either Mr. Capron failed to research the existing law before he vigorously advocated that Mr. Hentges had been exonerated on the Guaranty under Section 338 or he misrepresented the state of the law to the Court. Both are serious breaches of a lawyer's professional responsibility. *See* ORPC Rule 3.1—Meritorious Claims and Contentions ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for extension, modification or reversal of existing law"); ORPC Rule 3.3(a)—Candor to the Tribunal ("A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal; ... (3) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel ..."); *In re Chicago Midwest Donut, Inc.,* 82 B.R. 943, 948–49 (Bankr.N.D.Ill. 1988) ("minimum standard of professional responsibility requires an attorney to make reasonable inquiry into both the factual and legal basis for claims and defenses asserted.... Notwithstanding an attorney's sincere belief in the merits of his client's position, that attorney has a duty to ascertain the facts and review the law to determine whether the facts fit within a recognized entitlement to relief or defense."). Attorneys "owe a professional duty to [the] court not to misstate [factual and legal matters] or force the Court to spend precious time addressing meritless arguments." *Yorke v. Citibank, N.A. (In re BNT Terminals, Inc.),* 125 B.R. 963, 980 (Bankr.N.D.Ill.1990) (citing Bankruptcy Rule 9011(b)).[4]

4. Fed. R. Bankr.P. 9011(b)(2) provides that a lawyer shall not advocate a defense not warranted by the facts or existing law or a nonfrivolous argument for the modification of the existing law. Although Rule 9011 applies to representations asserted in pleadings signed by an attorney, and not oral representations (unless they arise in orally advocating matters asserted in signed pleadings), the fact that a sanction under Rule 9011 is not envisioned does not mean that oral advocacy of unwarranted legal theories is not a violation of professional ethics. *See* ORPC Rule 3.1. In this unusual case, Mr. Capron did not sign the Answer of Debtor to Involuntary Petition, in which Mr. Hentges denied that he was indebted to the Bank, because Mr. Hentges filed his answer *pro se.* However, Mr. Hentges also testified that he hired Mr. Capron to represent him in this case soon after the case was filed

In this case, the position Mr. Capron advocated was unambiguously contrary to the plain meaning of the statute he cited and relied upon and contrary to long-standing controlling case law which interpreted the statute under very similar facts. Mr. Capron did not advise the Court, and has never advised the Court, of the existence of controlling law that is directly adverse to his position as is required by ORPC Rule 3.3(a)(3) and (b) (counsel has a continuing duty to advise the court of controlling legal authority adverse to the position taken by the client).[5]

Thus, the record and the law support the Court's comment that Mr. Capron's argument that Mr. Hentges's liability on the Guaranty was exonerated based on an extension of the note had no legal merit and therefore constituted conduct that violated applicable rules of professional ethics.

**B. Mr. Capron's "argument that Marks Exhibit 5 was not properly authenticated had no legal basis." [6]**

At the hearing on March 30, 2006, counsel for one of the Petitioning Creditors offered into evidence Marks Exhibit 5, a certified copy of an Order Revoking License of Michael Edmund Hentges entered by Oklahoma Insurance Commission hearing examiner Leamon Freeman in the case of State of Oklahoma, *ex rel. Kim Holland v. Michael Edmund Hentges*, Case Nos. 05–0688–DIS and 05–1164–DIS. Transcript of Hearing of March 30, 2006 ("March 30th Transcript") at 84–85. On page six of the seven page document (the seventh page being a certificate of service) appeared the following certification:

> Insurance Commissioner of the State of Oklahoma, hereby certify [sic] that the foregoing is a true, correct and complete copy of the instrument herewith set out as appears of record in the Oklahoma Insurance Department this 28th day of March, 2006,
>
> Insurance Commissioner
>
> By [signature of Eva L. Jackson]

The raised seal of the "Insurance Commissioner, State of Oklahoma," appears over the certification. Mr. Capron objected to admission of the document because "the entire document is not certified. It appears that only one page of that is actually stamped." March 30th Transcript at 85. The Court inquired whether Mr. Capron knew "for a fact that the Insurance Commission, when it certifies copies that it

---

and Mr. Capron performed some research regarding defenses prior to the time Mr. Hentges filed his *pro se* answer. Transcript of Hearing of March 30, 2006, at 108, 111, 114–16, 123–24, 126; Hentges Exhibit 12. Thus, although Mr. Capron did not sign any pleadings in connection with his unwarranted legal argument, he adopted Mr. Hentges's denial of indebtedness and advocated that denial by misrepresenting the applicable law. While not technically sanctionable under Bankruptcy Rule 9011, oral misrepresentations of law nevertheless offend the essence of the rule.

As established later herein, however, certain factual allegations made by Mr. Capron in the Reply to Application of Counsel of Involuntary Debtor for Compensation and Reimbursement of Attorneys' Fees lacked any evidentiary support, implicating a violation of Bankruptcy Rule 9011(b)(3).

5.  Mr. Capron argues that "no contrary legal authorities were offered or advocated by the Petitioners." Motion to Modify at 2, n. 2. Under ORPC 3.3(a)(3), Mr. Capron, not opposing counsel, had the duty to advise the Court of adverse controlling legal authorities when he cited Section 338 as authority for his contention. Further, "[i]t is no defense to sanctions that counsel was unaware of authority that should have been known to a competent attorney." *In re Chicago Midwest Donut, Inc.*, 82 B.R. 943, 950 (Bankr.N.D.Ill. 1988) (rejecting the "pure heart, empty head defense" to Rule 11 sanctions).

6.  Order at 36, n. 21.

acknowledges it on every page or is that just your experience on other offices when they certify copies?" Mr. Capron stated: "Just my expectation, you Honor. I've never really dealt with the Insurance Commission to know." *Id.* at 87. The Court ultimately concluded that the certification complied with Rule 902(1) and (4) of the Federal Rules of Evidence, and therefore further evidence of authenticity was not required. Order at 6, n. 5. The Court acknowledges, however, that Mr. Capron could not have been prepared to cite authority for his objection at the hearing because Petitioning Creditors' counsel presented the certified copy to the Court on the day of the hearing (and the copy provided to Mr. Capron prior to the hearing was not so certified). March 30th Transcript at 85–86. The Court is not unduly concerned with unpersuasive off-the-cuff evidentiary objections, so long as they are not obviously unwarranted or interposed in bad faith or for the purpose of prolonging or obstructing the proceedings. To the extent that Footnote 21 appears to fault Mr. Capron for objecting to the admission of the Insurance Commission order without an adequate legal basis, the Court recognizes that confronting the certified copy of the order for the first time at the hearing is a mitigating circumstance. However, notwithstanding the mitigating circumstance, the Court concludes that Footnote 21 is essentially accurate and amendment of the Order is not warranted.

**C. Mr. Capron's "contention that Hentges offered to pay Marks in full with interest before she sued on the Notes was disingenuous, as Hentges merely proposed to trade the existing Notes for notes with lower interest rates." [7]**

In his opening statement at the hearing on March 30, 2006, Mr. Capron previewed the evidence he intended to present in support of Mr. Hentges's contention that the Petitioning Creditors acted in bad faith in filing the involuntary petition, in relevant part, as follows—

> [T]here'll be a number of other issues that we can present in terms of evidence that show that the effort was to embarrass and to harass Mr. Hentges. In particular, Mrs. Marks was offered to be paid, in full, with interest, prior to even filing suit.... However, she had a promise to pay, ... it was in a writing from an attorney—and a means on behalf of Mr. Hentges to pay, a means she was well aware of. She was given financial documents that showed exactly what insurance commissions had been earned and what she would be paid from them. Yet, rather than take the money that she could have gotten through those means, she went and filed suit.

March 30th Transcript at 15–16. In examining Mrs. Marks's attorney, Mr. Mitchell, Mr. Capron asked: "Isn't it true that Mr. Hentges offered to pay Virginia Marks in full? With interest?" When Mr. Mitchell responded: "No," Mr. Capron introduced a letter from Mr. Hentges's attorney, Cy Northrop, to Mrs. Marks's attorney dated June 27, 2005. In the letter, Mr. Northrop represented that, among other things, that "Mr. Hentges is financially unable to make a payment at this time;" "[h]e will not pay the usurious and other high rates called for in the notes"; "[h]e will not make a partial payment on a past due note"; and "[h]e will not pay if he gets sued." Hentges Exhibit 1. In light of Mr. Hentges's self-imposed conditions to any eventual payment, Mr. Northrop proposed that Mrs. Marks agree to cancel the existing notes and recalculate the debt with a lower in-

7. Order at 36, n. 21.

terest rate, for which Mr. Hentges would execute a new three year note. *Id.* at 32–33; Hentges Exhibit 1. As the Court observed at the time, and in the Order, this was hardly an offer to *pay* Mrs. Marks *in full with interest*; it was merely an offer to execute a new *promise to pay a lesser amount* (*i.e.*, the principal due plus accrued interest recalculated at a reduced rate) with interest thereafter accruing at an even lower rate, over a three year period. Order at 28.

■ Mildly "spinning" the established facts in favor of a client's position in a closing argument, for example, may not necessarily constitute outright misrepresentation, but the Court should be able to rely upon the veracity of counsel's representation as to the content of a document without having to examine the document to determine whether counsel's "spin" conceals material undisclosed facts. In this case, Mr. Capron knew or should have known that his statement that Mr. Hentges offered to pay Mrs. Marks in full and that Mrs. Marks refused to "take the money" would create the false impression that Mr. Hentges actually offered to pay Mrs. Marks cash which Mrs. Marks chose not to accept, opting instead to sue him in bad faith. Only by reading the letter could the

Court learn that Mr. Hentges represented to Mrs. Marks that he was *financially unable to pay her,* and that he offered to execute a note in an amount less than she contended was owed, which he would promise to pay over a three year time frame, facts which do not suggest any bad faith on the part of Mrs. Marks in her decision file a lawsuit to convert her claims against Mr. Hentges into a judgment.[8]

Thus, the Court's characterization of Mr. Capron's statement as "disingenuous" is supported by the record.

### D. "Most of the allegations made to establish bad faith were not supported with admissible evidence."[9]

■ In his Reply to Application of Counsel of Involuntary Debtor for Compensation and Reimbursement of Attorneys' Fees ("Reply Brief") (Doc. 54), Mr. Capron alleged eight specific instances of conduct that Mr. Hentges contended would demonstrate bad faith on the part of the Petitioning Creditors, including misrepresentation, fraud on the Court, abuse of process and extortion. Reply Brief at 2–3. In the Order, the Court addressed each allegation and concluded that Mr. Capron failed to present admissible or credible

8. Other examples of less than candid representations by Mr. Capron are alleged in the Petitioning Creditors' Response to Motion to Modify. In addition, the Court notes that in his opening statement, Mr. Capron alleged: "No one, to this date, has had an asset hearing in Tulsa County District Court, and I think that's very telling regarding whether they're really out to get this man's assets or to marshal them as they're now claiming, or whether they're out to punish him and to make his life very difficult." March 30th Transcript at 17–18. Testimony of Mr. Mitchell, however, revealed the following: "In lieu of conducting an asset hearing we [Mrs. Marks's counsel] conducted an asset hearing deposition pursuant to 12–O–S–Section 842." *Id.* at 31. Mr. Mitchell's statement was corroborated by Mr.

Hentges. *Id.* at 58–59 (Mr. Hentges testified that he had given testimony regarding his assets in August 2005 at the hearing before the Oklahoma Department of Insurance and later gave a deposition regarding his assets in December 2005). Again, Mr. Capron's focus on the absence of an "asset hearing" gave the false impression that the Petitioning Creditors randomly sent subpoenas and garnishments to financial institutions and insurance companies without *any* basis on which to believe these entities had relationships with Mr. Hentges or that they might have had assets owned by or owed to Mr. Hentges, or possibly information about Mr. Hentges's assets.

9. Order at 36, n. 21.

evidence sufficient to support any of these incendiary allegations, and the Court will not repeat itself here. *See* Order at 23–28.

Mr. Capron contends that he was not provided sufficient time to present such evidence. At the commencement of the hearing, Mr. Capron announced that on the issue of bad faith, he would examine Mr. Mitchell (Mrs. Marks's attorney), Mr. Hentges and Petitioning Creditor Mr. Hodgson. March 30th Transcript at 6. No other potential witnesses were in the courtroom. None of the testimony elicited from Mr. Mitchell was helpful in establishing bad faith on the part of the Petitioning Creditors. In the end, while Mr. Capron did not have time to examine Mr. Hodgson, he stated "I think I've gotten the information that I intended in prior testimony." March 30th Transcript at 88. Mr. Capron offered only two exhibits in support of Mr. Hentges's allegations of bad faith. One of these exhibits was inadmissible because it was not authenticated. Mr. Capron did not make an offer of proof to indicate what evidence he might have elicited from other witnesses that he contends he did not have time to call. Thus, it is mere speculation that further evidence would have established bad faith.

In light of Mr. Capron's certification, under Bankruptcy Rule 9011(b)(3), that to "the best of his knowledge, information and belief, formed after an inquiry reasonable under the circumstances," the "allegations and factual contentions" contained in the Reply Brief "have evidentiary support," it is remarkable that *none* of the specific allegations of fraud, misrepresentation, extortion, or abuse of process that were asserted as fact in the Reply Brief were supported with admissible evidence at the hearing. The Court's comment that Mr. Capron "stretched the boundaries of zealous advocacy without regard to … his obligations under Rule 9011" is supported by the record.

**E. The Petitioning Creditors' request for relief.**

In their Response to the Motion to Modify, the Petitioning Creditors allege other instances of misconduct by Mr. Capron, as well as potential perjury by Mr. Hentges, and request that the Court (1) deny the Motion to Modify; (2) sanction Mr. Capron for violating Bankruptcy Rule 9011, ORPC Rule 3.3, and 18 U.S.C. § 152; (3) award Petitioning Creditors fees and costs incurred in this proceeding; and (4) other relief to make the Petitioning Creditors whole and deter further misconduct.

As stated above, the Petitioning Creditors point out additional troubling inconsistencies between statements made by Mr. Capron and newly discovered evidence as well as inconsistencies between sworn testimony of Mr. Hentges and the newly discovered evidence. Mr. Capron has responded to the allegations in his Reply. The Court intends to review the pleadings and transcripts to determine whether any further proceedings on these allegations are warranted.

**Conclusion**

Accordingly, the Motion to Modify is denied and the relief requested in the Petitioning Creditors' Response is taken under advisement.

**Direction to the Clerk.**

As requested by the Bankruptcy Appellate Panel in connection with BAP Appeal No. NO–06–045, the Clerk of the Court shall notify the Bankruptcy Appellate Panel that the Motion to Modify has been resolved.

**SO ORDERED** this 1st day of June, 2006.